IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID JOSEPH MUNCHINSKI, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-CV-01712 |
| | ) | Chief Magistrate Judge Lisa Pupo Lenihan |
| HARRY WILSON, Warden of State | ) | |
| Correctional Institute at Fayette; and | ) | |
| ATTORNEY GENERAL'S OFFICE OF | ) | |
| PENNSYLVANIA, | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION

Petitioner David Joseph Munchinski ("Petitioner") filed this Petition for Writ of Habeas Corpus (ECF No. 1) on December 15, 2007, seeking to challenge under 28 U.S.C. § 2254, his 1986 homicide convictions in the Court of Common Pleas of Fayette County, Pennsylvania. Petitioner has shown that the prosecution withheld favorable evidence that could have been used to impeach the credibility of the sole individual who was able to provide purported eye-witness testimony placing Petitioner at the scene of the crime. Because the prosecution relied heavily upon this witness' testimony to support its case of first and second degree murder, and because of the utter lack of physical evidence tying Petitioner to the crimes, this Court is constrained to hold that the withheld evidence resulted in two first degree murder convictions and two second degree murder convictions that are unworthy of confidence. Additionally, given the degree to which the prosecution relied upon this witness' testimony to establish its case against Petitioner, this Court concludes that no reasonable trier of fact, but for the constitutional violations described below, could have convicted Petitioner of the above-mentioned crimes at his trial in

1986.  Accordingly, this Court will grant the writ, and order that Petitioner be granted a new trial.

## I.  RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The background of Petitioner's case spans over thirty years.  The portions that are relevant to this opinion are as follows.

### A.  The Crimes

In the early morning hours of December 2, 1977, Bonnie Blackson ("Blackson") and her husband were awakened by noises coming from the outside of their home in Bear Rocks, Fayette County, Pennsylvania.  Upon investigation, they discovered a man sitting slumped against the door of their front porch and making no visible movement.  They summoned EMTs, who confirmed the man was dead.  The body was later identified as that of James Peter Alford ("Alford").

The Pennsylvania State Police was notified, and troopers from the Uniontown barracks were dispatched to the scene.  Trooper Richard W. Powell and Corporal Richard Cecconello were the first to arrive.  During their initial investigation around the Blacksons' house, they discovered a trail of blood leading through a wooded area, toward a neighboring A-frame cabin. The officers drove to the cabin, which would later be identified as the residence of Raymond Gierke ("Gierke"), entered, and found a partially nude male body lying in a pool of blood.  This second body was later identified as that of Gierke.

At some point Fayette County Deputy Coroner Jack Powell ("Powell") was notified. After arriving at the scene himself, he made arrangements to transport the bodies of the victims to Connellsville State General Hospital for autopsy. Autopsies were performed that day by pathologist Dr. Sava Radisavljevic ("Dr. Sava").[1] Reports from these autopsies were delivered to the Fayette County Coroner's office on December 9, 1977. Addenda to these reports were delivered on December 17, 1977.[2] The autopsy reports indicated that Alford was killed by a close range gunshot wound that perforated his heart and lungs. 1986 Trial Tr. at 57 – 58. He also suffered from a second gunshot through his left elbow. Id. at 57. Gierke died from a small-caliber gunshot wound to his head, and a wound from a larger caliber bullet to his torso. Id. at 58, 62. He also suffered nonfatal bullet wounds to his right forearm and left middle finger. Id. at 58. Additionally, there was evidence that the two men were anally raped sometime prior to their murders.

Pennsylvania State Trooper Montgomery Goodwin ("Goodwin") was assigned to be the lead investigating officer in this case. See 1983 Trial Tr. at 230. From the first day of the investigation he worked closely with Corporal Robert Mangiacarne ("Mangiacarne"), also of the Pennsylvania State Police. Despite the existence of multiple suspects, the murders went

---

[1] According to the record Dr. Radisavljevic passed away on December 19, 1977 – a few days after completing the autopsies of the victims. See 1983 Trial Tr. at 71. He is called almost exclusively throughout the state court proceedings, as well as in the briefs in the federal proceedings, by the moniker "Dr. Sava." In order to remain consistent with the record in this case, this Court will refer to him in the same manner.

[2] One of the claims at issue in this case is whether one of these addenda contained exculpatory information that was improperly withheld from the Petitioner during his trials by the prosecution, in violation of Brady v. Maryland, 373 U.S. 83 (1963). This claim will be addressed in Part III of this opinion, infra.

unsolved for nearly five years.[3]  This changed, however, when Richard Bowen ("Bowen"), an

admitted burglar and forger, made a statement to the police, claiming to have been a witness to

the murders at Bear Rocks.

It is unclear from the record exactly how Bowen first came to the attention of the

Pennsylvania State Police as a potential witness.  His testimony in Petitioner's 1983 trial

indicates that he first contacted the authorities while he was incarcerated in Greensburg,

Pennsylvania.[4]  1983 Trial Tr. at 136 – 37.  This statement – in which it appears that Bowen

indicated only that Petitioner's eventual co-Defendant, Leon Scaglione ("Scaglione") had taken

credit for the murders – was made to Westmoreland County, Pennsylvania, authorities.  Id. at

137 – 38.  According to his testimony, Bowen spoke to authorities at least two additional times

regarding the murders, but was unclear about the dates.  Id. at 159.

While it is unclear from the record the exact dates of all of Bowen's multiple statements

to authorities, it is apparent that these statements differed materially from each other, and from

---

[3] The record indicates that, at least at some point in time, an individual named Ed Wiltrout was a suspect in the killings.  See 1983 Trial Tr. at 215 – 16.  Ed Wiltrout was at one time married to Deborah Dahlmann, one of the prosecution's witnesses in Petitioner's 1983 and 1986 murder trials.  He was also, at least partially, the subject of one of the pieces of evidence at issue in the current proceedings. See Mangiacarne/Carbone Report, PCRA III Trial Ct. Op. at 24 (ECF No. 21-25 at 27).

[4] Bowen's testimony during the 1986 retrial indicates that his first statement with respect to the murders might have been made in 1981 to a member of the Pennsylvania State Police - possibly Mangiacarne.  1986 Trial Tr. at 228, 232 – 233, 302.  Indeed, Goodwin testified during the 1986 retrial that Bowen had spoken to police regarding the murders at least three times prior to Petitioner's first trial.  Id. at 304 – 06.  The record suggests that Bowen's first statement regarding the murders may have been made as early as October of 1980.  1983 Trial Tr. at 137. Goodwin indicated in his testimony at the 1983 criminal trial that he had spoken to Bowen on June 24, 1981, September 9, 1982, and October 21, 1982.  Id. at 246 – 47.  The dates and number of the statements that Bowen made to police, as well as his motivations for making them, are not clearly defined in the record.

his eventual testimony at Petitioner's trials. His first statements regarding the murders did not implicate Petitioner. Id. at 247. In a later statement, he indicated that he did not enter Gierke's home on the night of the murders, or directly witness the shootings. 1986 Trial Tr. at 235, 304. At Petitioner's 1983 trial, Bowen testified that in his first statement to the authorities he indicated that Scaglione, Petitioner's co-defendant in the first criminal trial, had told Bowen that he was involved in the murders of Alford and Gierke. 1983 Trial Tr. at 137 – 38. Bowen denied having made such a statement during his testimony at Petitioner's 1986 retrial, and then backed away from the denial somewhat. 1986 Trial Tr. at 233 – 35. However, as of October of 1983, Bowen's story coalesced into an accusation that he had been the witness of, and unwilling participant in, Petitioner and Scaglione's murder of Alford and Gierke in the early hours of December 2, 1977. Based on this assertion, charges were filed against Petitioner and Scaglione, and the matter proceeded to trial.


**B.      1983 and 1986 Criminal Trials**

On October 22, 1982, Petitioner, along with co-defendant Leon Scaglione, was charged with two counts of Criminal Homicide, 18 Pa. Cons. Stat. Ann. § 2501(a), and two counts of Criminal Conspiracy to commit homicide, 18 Pa. Cons. Stat. Ann. § 903. The case went to trial in April of 1983. There was no physical evidence linking either individual to the crimes. Instead, the prosecution relied heavily on the testimony of Bowen, who, as stated above, claimed to have been an eyewitness to the murders, and whose testimony alone placed Petitioner at the scene of the crimes. The prosecutors also presented the testimony of Lori Lexa ("Lexa") and Deborah Sue Dahlmann ("Dahlmann"), two women who testified that Petitioner and Scaglione

forced them, at knife-point, to sit with them at a table in a bar on January 28, 1978, during which time they confessed to murdering Alford and Gierke. The record indicates that Lexa and Dahlmann had originally reported this incident to Trooper Goodwin on January 31, 1978 – several years prior to Petitioner's arrest. 1983 Trial Tr. at 245. The joint 1983 trial ended in a hung jury and, on April 12, 1983, a mistrial was declared. Thereafter, the Commonwealth dropped the conspiracy charges and the cases were severed for retrial.

Scaglione was retried in October of 1986 and found guilty of two counts of first degree homicide and two counts of second degree homicide. During his trial, Scaglione testified that Petitioner had no involvement in the murders, and instead asserted that he committed the murders with an individual named Homer Stuart – a person who allegedly bore some resemblance to Petitioner. 1986 Trial Tr. at 329 – 330. During his brief non-jury retrial in November of 1986, Petitioner sought to introduce Scaglione's trial testimony. Scaglione exercised his Fifth Amendment right against self-incrimination. Petitioner then sought to obtain use immunity for Scaglione's testimony, but this request was denied by both the prosecution and the trial court. In a lengthy sidebar, Judge Adams – the officiant of both the 1983 and 1986 trials – ruled that Scaglione's prior statements exonerating Petitioner were not admissible under Pennsylvania law. See id. at 329 – 31.

At Petitioner's 1986 retrial the prosecution once again had no physical evidence to tie Petitioner to the Bear Rocks murders. Instead, as in the 1983 trial, it relied on the testimony of purported eye-witness Bowen, who described, inter alia: how, where, and when he, Petitioner and Scaglione met prior to the murders; the method by which they traveled to Bear Rocks; the method by which they entered Gierke's home; the method and timing of the anal rapes

perpetrated on the victims; the firearms used in the commission of the murders; the motive for

the killings; and the details of the commission of the murders in general. The prosecution also

called Lexa and Dahlmann to the stand, who once again related their stories to the jury of the

January, 1978, incident during which Petitioner purportedly confessed to the killings.

Additionally, Bernard Furr ("Furr") was called to relate an incident which occurred that same

night in January of 1978, in which Petitioner confessed to the murders in a manner very similar

to that described by Lexa and Dahlmann. 1986 Trial Tr. at 276. Harold Eugene Thomas

("Thomas") also testified that Petitioner admitted to committing the killings while they were in

jail together in 1983. Id. at 262 – 63.

Petitioner was found guilty by a jury of one count each of first and second degree murder

with respect to Alford and one count each of first and second degree murder with respect to

Gierke. On December 8, 1986, Petitioner filed a Motion for New Trial and Arrest of Judgment.

After oral arguments this motion was denied and, on June 15, 1987, Petitioner was sentenced to

serve two consecutive terms of life imprisonment for the first degree murder convictions. The

trial court did not impose further penalty for the second degree murder convictions. Based on

the case presented by the prosecution, Judge Adams wrote the following summary of facts:

> On the night of December 1, 1977, the defendant, [David Joseph]
> Munchinski, met with Leon E. Scaglione, (hereafter called
> "Scaglione"), and Richard A. Bowen, (hereafter called "Bowen"),
> at "Harry's Bar" in Greensburg. Bowen was introduced to the
> defendant by Scaglione, who he had known for several years.
> Scaglione and the defendant told Bowen that they were going to
> Bear Rocks "to rip-off some drugs" and wanted Bowen to drive the
> car. (N.T. 179). Bowen agreed, and drove Scaglione and
> Munchinski to a cabin in Bear Rocks. Scaglione told Bowen to
> stop the car. Both Scaglione and the defendant exited the car and
> disappeared in the direction of the cabin. While sitting in the car,
> Bowen heard the sound of nails being pulled. After a few minutes,
> Scaglione returned to the car and asked Bowen to come into the

cabin, telling him "that I would like this, or I would dig this." (T. 181).

After entering the cabin, Bowen saw Munchinski "with a gun in his hand holding two fellows at gun point." (N.T. 181). Scaglione then demanded that the two men give them the drugs. They responded that they didn't have any. Scaglione then forced one of the men to take his pants off, and Scaglione sodomized him, (N.T. 182-183), after which Munchinski "did the same thing to the other fellow he had the gun on." (N.T. 183).

Afterwards, Munchinski and the man on whom he was holding the gun went into another room and "returned with a little jewelry box which was full of little bags of white powder." ( Id.) Scaglione became very excited at that point and then shot repeatedly the man he was holding at gun point (N.T. 184). Bowen moved for the door whereupon Munchinski turned his gun on him. Scaglione told him to "knock it off" and the defendant then turned around and began firing at the other man. ( Id.) Bowen then ran to the car and sat in the driver's seat, hearing several more shots being fired. Scaglione and the defendant then came running from the cabin yelling "get out of here." Bowen then drove the two back to Greensburg to the "William Penn Club."

The next day Bowen left for Oklahoma where he remained until the following March when he was extradited on other charges.

During the early hours of December 2, 1977, Bonnie Blackson and her husband were awakened by noises on the porch of their home at 866 Rockpool Road, Bear Rocks, which sits approximately fifty yards to the rear of the cabin where the killings took place. Upon investigation, they found a man sitting on their porch, slumping slightly, making no visible signs of movement. They called EMT's from Mount Pleasant who examined the man, finding him dead. The body was later identified as that of Peter Alford.

The Pennsylvania State Police were [sic] notified, and Trooper Richard W. Powell arrived, along with Corporal Richard Cecconello. They investigated around the Blackson home and found a trail of blood that led to the cabin in the rear. They entered the cabin and searched it, finding a partially nude male body lying in the living room in a pool of blood, and exhibiting several gunshot wounds. (N.T. 28). The body was later identified as that of Raymond Gierke.

On January 28, 1978, Debra Sue Dahlmann and Lori Jane Lexa, friends of the two murder victims, entered the "Five Points Bar" in Greensburg. After they walked into the bar, the defendant called Dahlmann to his table. He was seated with Scaglione and another man whose name she did not know. The defendant asked who Dahlmann had with her. She told him that her friend was Lori Lexa, to which the defendant asked, "Petie Alford's girl friend?" She said "yes." He then told them to sit down but they refused, and the defendant then pulled a knife and told them to sit down. (N.T. 159). They did. The defendant then told them to "speak the truth, say 'sala'," and he said "Petie Alford had said 'sala' before he died." (N.T. 159). The women asked Munchinski if he had seen Petie Alford at Bear Rocks before he died, and Munchinski said "yes." They also asked if he saw Gierke that night too, to which he responded that he had and that he had shot Gierke. (N.T. 158).

Scaglione became angry at this point, grabbing a beer bottle, hitting it on the table, and saying, "no, I am the one that shot Gierke. I stuck the gun up his nose and pulled the trigger." (N.T. at 158-159 and 169-170). The girls left soon after.

Earlier that night Bernard [F]urr had a conversation with the defendant in the "Five Points Bar." Furr had been there with a friend when he saw the defendant enter with Scaglione and a third man. Furr left the bar to take his friend home and then returned. When he re-entered the bar, Furr saw the defendant talking to a friend of Furr. The defendant then called Furr over to his table. Furr did not know who he was at the time, but went over to inquire what the defendant wanted. "I hear you've been looking for me," the defendant told Furr. Furr told him that he did not know what he was talking about, and the defendant then said, "I am the one that killed your friend, Mr. Alford." The defendant then proceeded to tell Furr of the killings and that they were killed because they owed fifty thousand dollars for drugs they had received. (N.T. 270). Furr had put the word on the street that he was looking for Alford's and Gierke's killers and was going to make them pay. (N.T. 277).

While Munchinski was serving time in the Fayette County Jail on these charges, he came in contact with Harold E. Thomas who was serving time on the charge of receiving stolen property. Munchinski told Harold Thomas that he, Scaglione, and Bowen went to Bear Rocks for the purpose of obtaining drugs, that while in Gierke's house they found the drugs were there but not as much

> as they expected, and they knew there were more drugs in the
> house.  Munchinski stated that Scaglione shot one guy and that he
> shot the other one as he was going out the back door.  He also told
> Thomas that the driver of the car who took them to Bear Rocks
> was Richard Bowen.  (T. 263-264).

1986 Trial Ct. Op. at 6 - 10.

On July 14, 1987, Petitioner filed a Notice of Appeal of the judgment and sentence with the Superior Court of Pennsylvania.  The Superior Court affirmed the judgment and sentence of the trial court on November 30, 1990.  Commonwealth v. Munchinski, 585 A.2d 471, 476 (Pa. Super. Ct. 1990).  Petitioner appealed this decision to the Pennsylvania Supreme Court, which denied allocatur on November 13, 1991.  Commonwealth v. Munchinski, 600 A.2d 535 (Pa. 1991) (table).

### C.    History of Collateral Proceedings

The record shows that, prior to instituting his current petition for habeas relief, Petitioner filed four state petitions for relief under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. § 9541 et seq., and one habeas petition in federal district court.  A relatively brief history of those proceedings is as follows.

On April 16, 1992, Petitioner filed his first PCRA petition ("PCRA I").  The judge who presided over both the 1983 and 1986 criminal trials retired from the bench in 1987, therefore this PCRA petition was assigned to the Honorable William J. Franks.

One of the bases for relief asserted by Petitioner during his first PCRA proceedings was a report written by Goodwin, detailing his encounter with Bowen on September 9, 1982.  PCRA I Trial Ct. Op. at 6 – 7 (ECF No. 20-58 at 7 – 8); Ex. to Pet'r's Br. in Supp. of Pet. (ECF No. 4-1

at 3 – 6).  In it, Goodwin related the circumstances surrounding a statement made by Bowen to the Pennsylvania State Police regarding the Bear Rocks murders.  During the PCRA I proceedings, it was revealed that a paragraph in that report had been removed, and the surrounding paragraphs had been pasted together in such a manner  as to conceal its removal. (ECF No. 20-58 at 7); (ECF No. 4-1 at 3 – 6).  This paragraph indicated that Bowen made a statement to the Fayette County District Attorney's Office on that date, which was recorded for future transcription, and that he signed a waiver.  (ECF No. 4-1 at 4).  The prosecutor at the 1986 retrial, then-Assistant District Attorney Ralph Warman[5] ("Warman"), testified at a hearing in those proceedings that he, himself, had intentionally removed the paragraph because, according to him, no statement was actually recorded or transcribed.  (ECF No. 20-58 at 8).  The Honorable Gerald Solomon[6] ("Solomon"), who prosecuted Petitioner's joint trial in 1983, and was District Attorney of Fayette County (and thus Warman's supervisor) during the 1986 retrial, corroborated Warman's testimony.  Id.  Relying upon their testimony, Judge Franks concluded that no recording had been made of Bowen's statement on September 9, 1982.  (ECF No. 20-58 at 9).

The record indicates that, based on the revelation of the deleted and concealed paragraph, Judge Franks ordered the Commonwealth to produce all Pennsylvania State Police investigation files related to the murders at Bear Rocks, as well as three additional files on Bowen, for in camera review.  See PCRA III Hearing Tr. of Aug. 13, 2003, at 11 (ECF No. 21-18 at 37 – 38). John Kopas, Esquire ("Kopas"), who represented the Commonwealth in those proceedings,

---

[5] The Honorable Ralph Warman is now a judge on the Court of Common Pleas of Fayette County.

[6] The Honorable Gerald Solomon is currently the President Judge of the Court of Common Pleas of Fayette County.

assured Judge Franks on multiple occasions that the files that he ultimately produced were true and correct copies of the complete files maintained by the State Police in Harrisburg, Pennsylvania.  PCRA III Trial Ct. Op. at 74 – 75 (ECF No. 21-27, at 2 – 3).[7]  Judge Franks reviewed the files, and ordered the production of everything that he deemed to be discoverable to Petitioner.  (ECF No. 21-27 at 3).  None of the documents that had been produced as part of Bowen's files were deemed to be discoverable by Judge Franks.  Id. at 11; see also PCRA III Trial Ct. Op. at 75.

The PCRA I trial court also reviewed evidence produced by Petitioner regarding a sworn deposition made by Bowen on April 4, 1992, recanting his testimony inculpating Petitioner in the murders of Alford and Gierke.  (ECF No. 20-58 at 9 – 11); PCRA III Ap. Ct. Op. at 8 (ECF No. 21-33 at 9).[8]  In this recantation, Bowen related how he had been coerced by members of the Fayette County District Attorney's office and the Pennsylvania State Police into providing perjured testimony at Petitioner's 1986 trial.  However, when Petitioner called Bowen to testify during those proceedings, he asserted his Fifth Amendment right against self-incrimination.

---

[7] The opinion of the PCRA III trial court spans three documents in Respondents' appendix.  See (ECF No. 21-25) through (ECF No. 21-28).  For the sake of clarity, this Court will cite directly to the pages of this opinion as it if it appeared as a single, consecutively-paginated document, and will not provide parallel citations to the docket.

[8] The opinion by the Superior Court reversing the PCRA III trial court's grant of relief spans several entries on the docket.  See (ECF No. 21-33) through (ECF No. 21-36).  As with the PCRA III trial court's opinion, this court will cite to this document directly, without providing parallel citations for its location on the docket.

Judge Franks subsequently granted Bowen immunity for his testimony, but Bowen rescinded his earlier recantation, and reaffirmed his testimony from the 1986 trial.[9]

Following several hearings, the trial court denied this first PCRA petition by Opinion and Order on August 5, 1993. (ECF No. 20-58). Petitioner appealed this decision to the Superior Court of Pennsylvania, which affirmed the denial of that petition on December 11, 1995. (ECF No. 21-5). The Pennsylvania Supreme Court denied allocatur on August 30, 1996. Commonwealth v. Munchinski, 683 A.2d 879 (Pa. 1996) (table).

On January 6, 1998, Petitioner filed his first petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Western District of Pennsylvania. Munchinski v. Price, Civil No. 98-0010 (W.D. Pa. filed Jan. 6, 1998). This petition was denied as being untimely. On appeal, the United States Court of Appeals for the Third Circuit affirmed the dismissal by the district court on January 24, 2001. Munchinski v. Price, 254 F.3d 1078 (3d Cir. Jan. 24, 2001) (table). Petitioner's counsel for this appeal was granted permission to withdraw by the Court of Appeals shortly before the expiration of the period for filing a petition for writ of certiorari. (ECF No. 21-33 at 13).

On May 12, 2000, during the pendency of his appeal from the dismissal of his first petition for writ of habeas corpus, Petitioner, acting pro se, filed another PCRA petition. Pro Se PCRA Pet. (ECF No. 21-9). In it, Petitioner alleged the existence of newly discovered evidence

---

[9] Petitioner sought to file a private criminal complaint against Bowen for perjury in 1995. However, this was disapproved by the district attorney and the court based on Judge Franks' grant of immunity to Bowen during the PCRA I proceedings. See Commonwealth ex rel. Munchinski v. Bowen, No. 1706 Pittsburgh 1995, unpublished memorandum at $1 - 2$ (Pa. Super. Ct. filed Apr. 16, 1996); see also PCRA III Ap. Ct. Op. at 9. Bowen committed suicide while incarcerated in Oklahoma. PCRA III Trial Ct. Op. at 9.

uncovered during the course of the litigation of his first habeas petition.[10]  This petition was dismissed just six days later, on May 18, 2000, after the trial court determined that Petitioner was still represented by counsel, and that it would be unlawful for the matter to proceed on a hybrid basis.  On July 27, 2000, Petitioner filed, through counsel, another PCRA petition ("PCRA II") (ECF No. 21-10).   Instead of addressing the new evidence on the merits, the PCRA II trial court concluded that it lacked jurisdiction to hear the matter because of the pendency of Petitioner's first habeas corpus petition in the United States Court of Appeals.  The PCRA II trial court informed Petitioner on August 3, 2000, that it would dismiss that petition unless Petitioner responded to the court within ten days.  Petitioner failed to respond and, on August 24, 2000, the PCRA II petition was dismissed.  (ECF No. 21-12).  There is no indication on the record that Petitioner appealed this dismissal to the Superior Court.

On March 21, 2001, less than sixty days after the United States Court of Appeals for the Third Circuit affirmed the dismissal of Petitioner's first habeas petition, Petitioner filed a third counseled PCRA petition ("PCRA III").  (ECF No. 21-13).  The resulting proceedings were overseen by the Honorable Barry Feudale.  This third PCRA petition was amended on April 15, 2003, and again on May 12, 2003, in order to include evidence discovered during its pendency. See PCRA III Ap. Ct. Op. at 37 – 38.  In it, Petitioner alleged that eleven pieces of exculpatory evidence were unlawfully suppressed by the prosecution during Petitioner's criminal trials in 1983 and 1986, as well as during his first PCRA proceedings.  This evidence consisted of the following:

---

[10] This petition contained a copy of the Bates Report as an exhibit.  Pro Se PCRA Petition (ECF No. 21-9 at 10).  None of the other pieces of evidence that were used to support the second PCRA petition were explicitly referenced in the pro se petition.

(1) The Bates report: a one-page report of trooper George F. Bates, dated January 6, 1978, relating an interview with Maria Caccia, who indicated that Bowen had left Pennsylvania for Oklahoma on December 1, 1977.[11] See PCRA Trial Ct. Op. at 17, 20; see also (ECF No. 4-1 at 2).

(2) The Goodwin/Powell report: a report, dated December 20, 1977, written by Goodwin. In this report, Goodwin indicated that Deputy Coroner Jack Powell informed him that it was believed that the anal intercourse to which Alford was subjected would have taken place 24 hours prior to his death.  PCRA III Trial Ct. Op. at 17, 21; see also (ECF No. 4-1 at 8).

(3) The Powell addendum: a typewritten summary of a phone call, attributed to Fayette County Deputy Coroner Jack Powell, dated December 14, 1977, indicating that the anal intercourse to which Alford was subjected possibly occurred "at least 24 hours" before his death. PCRA Trial Ct. Op. at 17, 22; see also (ECF No. 4-1 at 9).

(4) The addendum to Alford's autopsy: a one-page addendum to Alford's autopsy report, dated December 17, 1977 and signed by Dr. Sava, indicating that the medical samples taken from Alford's rectum were of blood group "A".  PCRA Trial Ct. Op. at 17, 23; see also (ECF No. 75).  Petitioner avers, and the Superior Court concluded, that Petitioner's blood group is "B". PCRA III Ap. Ct. at 78.  Dr. Sava noted in this report that contamination of the samples by the contents of Alford's own urethra "[could not] be entirely ruled out."  (ECF No. 75 at 6).

(5) The Mangiacarne/Carbone report: a report written by Corporal Mangiacarne, dated December 16, 1980, relating his interview of an individual named Elizabeth Carbone ("Carbone").  PCRA Trial Ct. Op. at 17, 24; see also (ECF 4-1 at 7).  According to this report,

---

[11] The Bear Rocks murders took place during the early hours of the following day, December 2, 1977.

Carbone described a detailed confession to the murders at Bear Rocks, given to her by an individual named Mike Urdzik ("Urdzik"). In this confession, Urdzik implicated one Ed Wiltrout ("Wiltrout") in the Bear Rocks murders.

(6) The Kinch report: a report written by Trooper Robert Kinch, dated December 19, 1977, which indicated that certain biological evidence, including nail scrapings, had been taken from Alford. The existence of this evidence was unknown to Petitioner until the report's discovery, sometime during the pendency of his first habeas appeal. PCRA III Trial Ct. Op. at 17, 25 – 26; see also (ECF No 4-1 at 8 – 9).

(7) Bowen's parole revocation documents: four pages of documents from Westmoreland County, Pennsylvania, related to parole revocation hearings for Bowen in 1983. PCRA III Trial Ct. Op. at 17, 27 – 30; see also (ECF No. 4-1 at 11 – 14). Petitioner argues that multiple passages in these documents support the conclusion that an undisclosed agreement for leniency existed between Bowen, the Westmoreland County District Attorney's office, and the Fayette County District Attorney's office. Examples of these passages include: "[t]he Actor [Bowen] is present [sic] [in] a situation which could solve his charges. . . " (ECF No. 4-1 at 12), and "[t]his petition was not filed before this date at the request of [then Westmoreland County, Pennsylvania,] D.A. John J. Driscoll because of [Bowen's] role as a witness in a murder trial Fayette County." Id. at 13 – 14. See also PCRA Trial Ct. Op. at 89.

(8) The Dunkard/Proud report: a report written by Trooper Edward Dunkard ("Dunkard"), dated December 5, 1977, indicating that Delores Proud ("Proud"), then a dispatcher for the Mt. Pleasant, Pennsylvania, Police Department, received a call at 2:32 A.M. on December 2, 1977, from a telephone operator, who stated, "'[a] man said he was shot and lives at

837 Alpine Rd., in Bear Rocks.'" PCRA Trial Ct. Op. at 17, 31; <u>see</u> <u>also</u> (ECF No. 4-1 at 15).

The report also indicates that Proud received a call about eighteen minutes later requesting an

ambulance from Bonnie Blackson, the woman who discovered Alford's body on her porch.

(ECF No. 4-1 at 15).

(9) The Veil/Mangello report: a one page report written by Trooper Richard Veil

("Veil"), dated June 23, 1986, in which inmate Robert Lee Mangello ("Mangello") indicated that

Joseph Lucy ("Lucy"), Petitioner's criminal co-defendant Scaglione, and a third, unnamed man,

committed the murders at Bear Rocks in "1972-1973". PCRA III Trial Ct. Op. at 17, 32; <u>see</u> <u>also</u>

(ECF No. 4-1 at 16). The record indicates that this document came into Petitioner's possession

on March 10, 2003, during discovery for his third PCRA proceedings. PCRA III Ap. Ct. Op. at

37.

(10) The Madden/Lucy report: the October 15, 1986, report of Trooper William F.

Madden ("Madden"), in which Lucy denied Mangello's accusations. PCRA III Trial Ct. Op. at

18, 33; <u>see</u> <u>also</u> (ECF No. 4-1 at 17). However, Lucy went on to say that Mangello had indicated

that he was a witness to the shootings at Bear Rocks himself. The record indicates that this

document came into Petitioner's possession on March 10, 2003, during discovery for his third

PCRA proceedings. PCRA III Ap. Ct. Op. at 37.

(11) The marked Bates report: a second copy of the above-mentioned "Bates report,"

received during the course of discovery on March 10, 2003. <u>See</u> (ECF No. 4-1 at 1). Petitioner

argues that, due to the markings made on the report, which emphasize, inter alia, the passage

"and BOWEN left on the 1st of December" (emphasis in original), this exhibit is materially

different from the unmarked version that had been discovered earlier. Petitioner avers that this

version of the Bates report was marked in this manner when he received it, and argues that this bolsters his contention that prosecutors knew of the exculpatory information (i.e., that Bowen was in transit to Oklahoma) at the time of the murders at Bear Rocks on December 2, 1977.  See Pet'r's Pet. (ECF No. 1 at 20).

Additionally, Judge Feudale examined evidence indicating that a tape recording had been made of a statement that was taken from Bowen on September 9, 1982, which had never been produced to Petitioner.  This evidence included a police report written by Goodwin ("Goodwin report") on September 9 or 10, 1982, that was produced at the PCRA I proceedings, as mentioned above.  See (ECF No. 4-1 at 3 – 6).  Judge Feudale held that Petitioner had demonstrated by a preponderance of the evidence that a tape of this statement existed and was improperly concealed and withheld by the Commonwealth – the result of which was a violation of Brady.[12]  See PCRA III Trial Ct. Op. at 60, 68.  The PCRA III trial court also addressed the existence of waiver forms signed by Bowen on September 9, 1982, prior to making his statement to authorities from Fayette County.  See (ECF No. 4-1 at 20 – 21).

Following several days of hearings, the third PCRA petition was addressed on the merits. In his 114-page opinion, Judge Feudale found the actions of the prosecution in Petitioner's 1986 retrial to be so egregious that they "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place."  PCRA III Trial Ct. Op. at 68. (emphasis in original removed).  This determination was made based on an analysis of all

---

[12] It is clear from the language of the third PCRA trial court's opinion that Judge Feudale found the method of concealment of this tape – the intentional alteration of a police report by the Fayette County District Attorney's office – to be particularly egregious.  Unfortunately, for the reasons stated below, the alteration of this report is not properly before this Court and, consequently, does not provide a direct basis for relief.  However, it is worth noting that this Court is of the opinion that such conduct is nothing short of outrageous.

evidence presented by Petitioner, collectively, viewed in light of the record as a whole. Judge Feudale also found that Solomon and Warman had committed deliberate acts of prosecutorial misconduct during Petitioners 1983 and 1986 trials. Id. at 64 – 65, 68 – 69, 102 . Judge Feudale made a similar finding regarding the actions of Kopas during Petitioner's first PRCA proceedings. Id. at 72 – 73, 102. Finally, Judge Feudale determined that, based on the Goodwin report, as well as new testimony from Goodwin during the PCRA III hearings, that a tape was made of Bowen's statement of September 9, 1982. Id. at 60.

In light of these findings, on October 1, 2004, Judge Feudale ordered that Petitioner's 1986 convictions be vacated. Petitioner was to be granted a new trial in the event that contested tape-recorded evidence could be provided for him by the Commonwealth within ten days. In the event that the Commonwealth did not provide the evidence, Petitioner's conviction and sentences were to be vacated and he was to be discharged forthwith.

The Commonwealth appealed the order of the PCRA III trial court on October 8, 2004. The Superior Court of Pennsylvania, in an unpublished 119-page opinion, reversed Judge Feudale on December 14, 2005. Commonwealth v. Munchinski, 894 A.2d 821 (Pa. Super. Ct. 2005) (table) (ECF Nos. 21-33 – 21-36). Specifically, the Superior Court found that all of the evidence presented to the PCRA III trial court that Petitioner claimed had been discovered during the appeal of the dismissal of Petitioner's first petition for writ of habeas corpus had been procedurally defaulted under the Pennsylvania Post Conviction Relief Act. That court's decision was based on the fact that this evidence, which had been discovered sometime in 2000 or 2001, could not have been presented to the PCRA III court within 60 days of discovery, as required by the Act, see 42 Pa. Cons. Stat. Ann. § 9545(b), and that the failure to do so stripped the

Pennsylvania courts of jurisdiction to adjudicate Petitioner's claims based on this evidence. PCRA III Ap. Ct. Op. at 27. The Superior Court also held that the issue of whether a tape recording had been made of Bowen's interview with the Fayette County District Attorney's office on September 9, 1982 had been fully litigated during the Petitioner's first state post-conviction proceedings, and that Judge Feudale's reopening of that issue was improper – in spite of new testimony from Goodwin regarding his refreshed recollection of the making of the tape of Bowen's interview that day. <u>See</u> PCRA III Ap. Ct. Op. at 58 – 66.

However, the Superior Court did conclude that the two pieces of evidence discovered during the PCRA III proceedings themselves (*i.e.,* the Madden/Lucy report of October 15, 1986, the Veil/Mangello report of June 23, 1986) were facially timely submitted, despite the purported impropriety of the order requiring their production by the Commonwealth. <u>Id.</u> at 38. As such, there was no finding that these were procedurally defaulted under the PCRA.

Finally, the Superior Court analyzed the materiality of each purportedly-suppressed pieces of evidence adduced by Petitioner in support of his third PCRA petition. That court found that no individual piece of evidence, when compared to the record of the 1986 trial as a whole, was sufficiently likely to have led to a different result at that trial to warrant relief. <u>See</u> PCRA III Ap. Ct. Op. at 83. Consequently, that court concluded that the withholding of said evidence did not rise to the level of constitutional violations, and, even had Petitioner's claims been timely under the PCRA, he would still not be entitled to relief. Relying on this conclusion, the Superior Court reversed PCRA III trial court's grant of relief on December 14, 2005. <u>See</u> PCRA III Ap. Ct. Op. at 1.

Subsequent to this reversal, Petitioner petitioned the Pennsylvania Supreme Court for allocatur on January 16, 2006, and was denied on February 8, 2007. Commonwealth v. Munchinski, 918 A.2d 744 (Pa. 2007) (table) (ECF. No. 21-39). No petition for certiorari to the United States Supreme Court was filed.

On December 15, 2007, Petitioner filed with this Court the instant numerically second petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Petitioner consented to allow this petition to be adjudicated by a United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c)(1), on June 26, 2008. Respondents consented to the same on June 30, 2008. On August 26, 2009, this Court determined that this petition for writ of habeas corpus constituted a "second or successive petition" under the meaning of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See 28 U.S.C. § 2244(b); see also Mem. and Op. (ECF No. 55). Consequently, this Court lacked jurisdiction over the petition, as it had been improperly filed directly with the district court, and not first with the court of appeals, as is required under the AEDPA. 28 U.S.C. § 2244(b)(3). Accordingly, on August 26, 2009, this petition was transferred to the United States Court of Appeals for the Third Circuit, pursuant to 28 U.S.C. § 1631, so that court could perform its statutory gate-keeping function. See Order (ECF No. 56).

On November 5, 2009, the Court of Appeals granted authorization for this Court to proceed with the adjudication of this petition, finding that Petitioner "ha[d] made a prima facie showing that his petition contain[ed] newly discovered evidence." USCA Order Granting Successive Habeas Pet. (ECF No. 58 at 1). It is important to note that the court of appeals underscored the limited nature of the scope of this Court's review of Petitioner's evidence, pursuant to 28 U.S.C. § 2244, as well as the necessity for this Court to engage in a thorough

analysis of the procedural issues raised in this petition, prior to reaching the merits of Petitioner's claims.  Accordingly, this Court proceeds mindful of the instructions of the court of appeals, and cognizant of the heavy burden that Petitioner must meet in order to prevail.  See 28 U.S.C. § 2244(b)(2).

## III.    PROCEDURAL ISSUES

Before this Court can address the merits of Petitioner's numerous allegations of Brady violations, it is necessary to examine whether this petition fulfills the applicable procedural requirements set forth in the AEDPA.

### A.    Discovery of the Evidence.

Petitioner bases his claims for habeas relief on the alleged suppression of several pieces of purportedly exculpatory evidence during his criminal trials and first PCRA proceedings.  This evidence is made up of the above-mentioned eleven documents, as well as the September 9, 1982 Goodwin Report, two waivers signed by Bowen on that date, and a tape that was purportedly made of Bowen's alleged statement given on that date.  See generally, (ECF No. 1).

In his brief, Petitioner alleges that he first came into possession of the entirety of the above-mentioned eleven pieces of evidence sometime in 2000 or 2001 – during the pendency of his appeal from this Court's dismissal of his first habeas petition.[13]  See, e.g., Pet'r's Br. in Supp.

---

[13] Petitioner has never provided an exact date on which he discovered his additional evidence during the pendency of the appeal from the denial of his first habeas petition.  This is troubling, given the unforgiving deadlines imposed by the AEDPA and the high standard that must be met (continued . . .)

of Pet. (ECF No. 4 at 32). An examination of the record belies this assertion. While *some* of the above-mentioned documents appear to have been discovered on an unknown date or dates while the first habeas petition was before the Court of Appeals, others were clearly discovered as early as the 1983 criminal trial itself, or as late as during the pendency of Petitioner's third PCRA proceedings. As such, in order to adjudicate whether the evidence adduced by Petitioner is properly before this Court, it is necessary to digress briefly to determine *when* the record indicates that it first came into Petitioner's possession.

The performance of this task, as well as the subsequent procedural analysis of Plaintiff's claims, is made easier by sorting the evidence into three groups: (1) evidence that was discovered during the pendency of the third PCRA proceedings; (2) evidence that was discovered prior to the filing of Petitioner's first habeas action; and (3) evidence that was, in fact, discovered sometime during the pendency of Petitioner's appeal from the denial of his first habeas petition.

The record is clear that the following evidence was discovered during the pendency of Petitioner's third PCRA proceedings: (1) the Veil/Mangello report; (2) the Madden/Lucy report; and (3) the marked copy of the Bates report. In its opinion, the Superior Court made the specific factual finding that these three pieces of evidence first became available to Petitioner on March 10, 2003, as part of a response to discovery requests in the third PCRA proceedings. PCRA III Ap. Ct. Op. at 37 – 38. However, the Superior Court treated the marked copy of the Bates report

---

in order to merit the benefits of equitable tolling. Furthermore, the Superior Court provided pointed criticism of this flaw during Petitioner's third PCRA proceedings. See PCRA III Ap. Ct. Op. at 22 (ECF No. 27 at 23).

as being identical to unmarked copy, and found, ultimately, that it was untimely under the PCRA for the same reasons as the unmarked copy.[14]  PCRA III Ap. Ct. Op. at 39.

The second group of evidence – that which was discovered prior to the filing of Petitioner's first habeas petition, is comprised of the following items.

The first piece of evidence in this group is the addendum to Alford's autopsy report. (ECF No. 75).  While Petitioner claims to have discovered this piece of evidence for the first time during his appeal of the denial of his first habeas petition, the Superior Court found otherwise, citing the testimony of then Fayette County Coroner Nita Rich, and Dr. Palaez during Petitioner's 1983 murder trial.  PCRA III Ap. Ct. Op. at 75.  Specifically, the testimony of then-Coroner Rich indicates that *at least* one autopsy addendum, possibly relating to Gierke or Alford, or both, was entered into evidence during the 1983 trial.[15]  1983 Trial Tr. at 95.  The 1983 testimony of Dr. Palaez refers to an addendum as well, mentioning that spermatozoa was found in the recta of both Alford and Gierke, that blood group tests were performed, and that the tests

---

[14] There is nothing in this factual determination that is unreasonable, and as such, this Court is bound to defer to it.  Even if the undersigned could find some additional information in the underlining of various passages of the report, when viewed in the light most favorable to Petitioner, it supports only the conclusion that this piece of evidence was willfully suppressed by some agent of the prosecution.  However, this, in and of itself, does not provide an additional avenue of relief.  See  United States v. Agurs, 427 U.S. 97, 110 (1976) ("[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor").

[15] In spite of the Order of this Court that Respondents produce the exhibits to Petitioner's 1983 and 1986 murder trial, said exhibits are not on the record before this Court.  See Minute Entry of July 21, 2010 (ECF No. 67).  On August 4, 2010 – the date on which the exhibits were due – Respondents filed a letter indicating that it was having difficulty locating the exhibits.  (ECF No. 68).  At no point did Respondents move for an extension of time.  It was not until October 27, 2010, that Respondents partially complied with this Court's order of July 21, 2010, and produced some of these exhibits.

were possibly contaminated by the contents of the victims' own urethras.[16]  ECF No. 20-1 at 37

– 41.  Furthermore, Dr. Pelaez quotes language that is identical to that found in the addendum to

Alford's autopsy report – "[i]n view of a very small number of spermatozoa seen, low acid

phosphatase activity and results of blood group antigen detection, contamination of rectum from

deceased's own urethra during autopsy cannot be entirely ruled out."  Id. at 39 – 40; cf. PCRA

III Tr. Ct. Op. at 23.

Additionally, in an extremely tardy and incomplete response to this Court's order of July

21, 2010, (ECF No. 67), Respondents filed some of the exhibits from Petitioner's 1986 retrial.

(ECF Nos. 73 – 75).  One of these documents lists the pathology reports of Gierke and Alford (as

exhibits six and seven, respectively) as having been entered into evidence at those proceedings.

Respondents also submitted copies of these reports, both having been stamped with

corresponding exhibit numbers.  (ECF No. 73 – 75).  At the end of Alford's autopsy report is

appended the addendum in question.  (ECF No. 75 at 6).

Petitioner argues that the testimony of these witnesses refers to an addendum to Gierke's

autopsy, and not Alford's.  However, it is Petitioner's burden to rebut the Superior Court's

factual findings with clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).  Given the

evidence that exists on the record before this Court, Petitioner has failed to meet his burden with

respect to this issue.  As such, this Court is constrained to defer to the Superior Court's

determination that Petitioner became aware of the existence of the addendum to Alford's autopsy

report during his 1983 trial.

---

[16] For reasons that are never explained in the record, Dr. Palaez's testimony in the 1983 criminal
trial was recorded under separate cover, and is not bound with the rest of the transcript from that
trial.

The second piece of evidence that fits into this group is a set of records from the Court of Common Pleas of Westmoreland County, Pennsylvania, concerning the disposition of probation violation proceedings against Bowen. PCRA III Ap. Ct. Op. at 78; see also PCRA III Trial Ct. Op. at 27 – 30. The Superior Court determined that these documents were known to Petitioner as early as July 2, 1992, when then-Chief Deputy Clerk of Courts for Westmoreland County, Donald L. Heagy, Jr., read parts of them into the record of the first PCRA proceedings. PCRA III Ap. Ct. Op. at 79. An examination of the relevant portion of the transcript of those proceedings indicates that at least the first two of the four pages in question were indeed directly quoted. PCRA I Trial Tr. of July 2, 1992, at 22 – 23 (ECF No. 20-29 at 25 – 26). The record also indicates that Bowen's criminal file from Criminal Action No. 1356 of 1977 was entered into the record of those proceedings as Petitioner's Exhibit 9. Indeed, parts of the very documents from Bowen's parole revocation hearings that are submitted as a basis for granting the writ were read into the record during Petitioner's first PCRA proceedings. (ECF No. 20-29 at 36); see also (ECF No. 4-1 at 11 – 14). The final piece of evidence at issue is the Goodwin Report, which relates Goodwin's interactions with Bowen on September 9, 1982. See PCRA III Ap. Ct. Op. at 53; see also (ECF 4-1 at 3 – 6). It is uncontested that the original version of this report contained a paragraph relating to an official statement given by Bowen to prosecutors on that date, and that Warman had cut out this paragraph and re-pasted the surrounding paragraphs in a manner that concealed its deletion prior to the altered report being turned over to Petitioner during his 1983 trial. PCRA III Ap. Ct. Op. at 54 – 55. Indeed, this was the subject of its own hearing during the first PCRA proceedings. Id. at 54 – 55.

Warman's position during the first PCRA proceedings was that this paragraph referred to a recorded statement given by Bowman that did not, in fact, exist. The PCRA I trial court was persuaded that no recorded statement existed, as was the Superior Court when it decided Petitioner's appeal from the PCRA I trial court's denial of relief. See id. at 56 – 57. The Third PCRA trial court found the Commonwealth's reliance on this argument to be, in a word, incredible. PCRA III Tr. Ct. Op. at 60.

However, regardless of whether a recorded statement of Bowen from September 2, 1982, exists, it is clear that Petitioner knew of the deleted paragraph referencing it in the Goodwin report sometime, at the latest, in 1992.

The final group of evidence is made up of that which was discovered by Petitioner at some unspecified time during the pendency of Petitioner's first habeas appeal, and is comprised of (1) the Bates report; (2) the Goodwin/Powell report indicating that someone – possibly Deputy Coroner Powell – was of the opinion that the victims had been exposed to anal sex 24 hours prior to their deaths; (3) the Powell addendum– the subject of which was contained in Goodwin/Powell report; (4) the Mangiacarne/Carbone Report; (5) the Kinch report making an inventory of physical evidence taken from the scene of the murders; and (6) the Dunkard/Proud report. This group is more problematic than the previous two because, as stated above, Petitioner has failed to indicate when he came into possession of this evidence with any specificity.

In its opinion reversing the third PCRA trial court's grant of relief, the Superior Court expressed its frustration with Petitioner's vague and sometimes contradictory assertions of when he actually discovered the evidence on which he based his claims for relief. PCRA III Ap. Ct. Op. at 22 – 24. That court noted that some of the asserted evidence appeared in Petitioner's pro

se PCRA petition, which was filed on May 12, 2000, and therefore must have been discovered on or before that date.[17]  PCRA III Ap. Ct. Op. at 23.

As best as the Superior Court was able to determine, based on the paucity of concrete information provided by Petitioner, the remaining evidence from this final group came into Petitioner's possession sometime between July 27, 2000, and August 24, 2000 – the pendency of Petitioner's second counseled PCRA proceedings.  See PCRA III Ap. Ct. Op. at 23 (ECF No. 21-33 at 24).  This conclusion was based on an assertion of the same by Petitioner in his initial petition for relief during the PCRA III proceedings.  (ECF No. 21-13 ¶¶ 8 – 9).  These factual findings by the Superior Court have not been challenged by the parties, nor has any evidence been presented that would provide a basis for this Court to deviate from that court's determination regarding the dates of discovery of this evidence.

**B.      AEDPA's Statute of Limitations**

The first consideration in reviewing a federal habeas corpus petition is whether the petition was timely filed under the one-year limitations period applicable to such petitions.  In this regard, the federal habeas corpus laws impose a one-year limitations period applicable to state prisoners, which provides as follows.

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –

---

[17] The evidence asserted in the pro se PCRA motion included the unmarked copy of the Bates Report, (ECF No. 21-9 at 10), as well as various other documents relating to Bowen.  Petitioner's second counseled PCRA motion, which was submitted on July 27, 2000, was explicitly based on the same evidence adduced in support of his pro se motion.  (ECF No. 21-10 at 3, 8).

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d) (as amended).

The Court of Appeals for the Third Circuit has held that the statute of limitations set out in § 2244(d)(1) must be applied on a claim-by-claim basis.  Fielder v. Varner, 379 F.3d 113, 122 (3d Cir. 2004), cert. denied sub nom. Felder v. Lavan, 543 U.S. 1067 (2005).  Thus, in analyzing whether a petition for writ habeas corpus has been timely filed under the one-year limitations period, a federal court must undertake a three-part inquiry.  First, the court must determine the "trigger" date for the individual claims raised in the petition.  Typically, this is the date that the petitioner's direct review concluded and the judgment became "final" for purposes of triggering the one-year period under § 2244(d)(1)(A).  Second, the court must determine whether any "properly filed" applications for post-conviction or collateral relief were pending during the

limitations period that would toll the statute pursuant to § 2244(d)(2).  Third, the court must

determine whether any of the other statutory exceptions or equitable tolling should be applied on

the facts presented.  See, e.g., Nara v. Frank, No. 99-5, 2004 WL 825858, at *3 (W.D. Pa. Mar.

10, 2004) (Caiazza, C.Mag.J.).


### 1.   Timeliness of Plaintiff's Claims

The statute of limitations analysis begins with the evidence in Group 1, which includes

the Veil/Mangello report and the Madden/Lucy report.  The Superior Court found that these

pieces of evidence were discovered by Petitioner as part of a discovery submission on March 10,

2003.  Petitioner first filed these pieces of evidence, under the meaning of § 2244(d)(2), on May

12, 2003.  PCRA III Ap. Ct. Op. at 37 – 38.  While the time between discovery and filing

appears, on its face, to put this evidence outside of the 60-day time limit proscribed by the

PCRA, see 42 Pa. Cons. Stat. Ann. § 9545(b), the Superior Court held that Petitioner's April 15,

2003, PCRA III filing was sufficient to cure any defect in the timeliness of the above-mentioned

evidence.  PCRA III Ap. Ct. Op. at 37.  Thus, these pieces of evidence were "properly filed" for

the purposes of calculating the one-year filing period for the instant petition under the AEDPA.

The clock for calculating whether the AEDPA statute of limitations evidence began to

run on the date of discovery – March 10, 2003.  The statute was tolled by § 2244(d)(2) on April

15, 2003 – the date on which Petitioner filed his amended PCRA III petition including this

evidence – and remained so until the Pennsylvania Supreme Court denied allocatur on February

8, 2007.  The clock ran from that date until December 15, 2007 – the day that the instant action

was filed with this Court.  Thus, the total number of days after Petitioner discovered this

evidence until the date of filing of this action, not including the time that Petitioner's claims were statutorily tolled, is 346 –short of one year. As such the Veil/Mangello report and the Madden/Lucy report are timely for the purpose of these habeas proceedings.

The second group created for the purposes of analysis under § 2244(d)(1) consists of evidence that the Superior Court has determined was known to Petitioner prior to his first habeas petition. This evidence, consisting of the Goodwin report, the addendum to Alford's autopsy report, and records of lenient treatment that Bowen received during parole proceedings, was available to Petitioner during or before his first PCRA proceedings in 1992, which pre-dated his first habeas petition. As that first habeas petition was found to be untimely by this Court, and that decision was affirmed by the court of appeals, it logically follows that the above evidence is untimely for the purposes of the current petition as well under § 2244(d).[18] See (Docs. 28, 32) Price, No. 98-10 (W.D. Pa. filed Jan. 6, 1998).

The final group of evidence is that which was discovered during the pendency of Petitioner's first habeas petition. This consists of (1) the Bates report; (2) the Goodwin/Powell report; (3) the Powell addendum; (4) the Mangiacarne/Carbone report; (5) the Dunkard/Proud report; and (6) the Kinch report.

From the record it appears that Petitioner became aware of this after-discovered evidence on two different, albeit unknown, dates sometime in 2000 or 2001, during the pendency of his appeal from the dismissal of his first habeas petition. While Petitioner's filings do not indicate the precise dates of their discovery, this Court is able to make the following conclusions from the

---

[18] To the extent that Petitioner attempts to argue that he was denied effective representation due to his counsel's failure to present any of this evidence that was available at trial, his claim is untimely for the same reasons.

record. First, the Bates report, which was included in Petitioner's pro se PCRA petition, filed on May 12, 2000, must have been discovered on or before the date of its filing. That Petition was dismissed on May 18, 2000 as an unlawful hybrid petition.[19] As such, it appears that this petition was not "properly filed" under the meaning of the AEDPA so as to stop the clock on the statute of limitations with respect to the Bates report. Additionally, Plaintiff waited 70 days before filing a counseled PCRA petition based on this evidence. As this was clearly outside the 60-day window that the PCRA allows for asserting new evidence, it appears that there was never a properly filed petition in state court that included the Bates report.

On July 27, 2000, Petitioner filed his second PCRA petition. He asserts that it was during the pendency of this petition – between July 27, 2000, and August 24, 2000, that he discovered the remaining five elements of this group. As Petitioner has failed to provide any indication to the contrary, this Court is constrained to use July 27, 2000 as the trigger date under 28 U.S.C. § 2244(d)(1)(D), and to calculate the statute of limitations from that date. Additionally, as Petitioner never asserted the above evidence (except for the Bates report) in his second PCRA petition, and his third PCRA petition was not filed until March 21, 2001 – beyond the 60-day period of time allowed by the PCRA – it is clear that Petitioner does not have the benefit of a "properly filed" state court collateral proceeding to toll the AEDPA's unforgiving statute of limitations.

Starting the clock on the Bates report at May 12, 2000, and stopping it on December 15, 2007, this Court concludes that Petitioner was in possession of this piece of evidence for 2773 days prior to the institution of the current habeas petition. Similarly, using July 27, 2000 as a

---

[19] Under the Pennsylvania Rules of Appellate Procedure, Petitioner had 30 days to file an appeal from this dismissal. See Pa. R.A.P. 903(a). The record does not indicate that he ever did so.

trigger date for the remaining five pieces of evidence, it is clear that they were in Petitioner's possession for 2699 days. Neither calculation enjoys the benefit of statutory tolling.

Under normal circumstance, the evidence in group three could not enter into the determination of whether to grant the writ. However, Petitioner argues that he should be granted equitable tolling of the AEDPA's statute of limitations based on the specific facts of his case. Accordingly, this Court will analyze the circumstances surrounding Petitioner's facially untimely submission of this group of evidence in order to determine whether, and to what extent, the statute of limitations should be equitably tolled.

### 2. Equitable Tolling

In <u>Holland v. Florida</u>, the United States Supreme Court recently affirmed the availability of equitable tolling of the AEDPA's one year statute of limitations under appropriate circumstances. 130 S.Ct. 2549 (2010). In its opinion, the Court first underscored that the one year statute of limitations in the AEDPA was not jurisdictional, and "does not set forth 'an inflexible rule requiring dismissal whenever' its 'clock has run.'" <u>Id.</u> at 2560 (quoting <u>Day v. McDonough</u>, 547 U.S. 198, 208 (2006)). Given that habeas corpus is, at its heart, an equitable form of relief, and with no well-defined congressional intent to the contrary, the Court asserted that it is proper, under the principles of equity, to toll the statutory one year period for filing a petition under § 2254 in certain cases. <u>Holland</u>, 130 S.Ct. at 2561 – 62. In order for a delay in filing a habeas petition to qualify for equitable tolling, a petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." <u>Id.</u> at 2162 (quoting <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 418

(2005)).  "Mere excusable neglect is not sufficient."  Miller v. New Jersey State Dep't of Corr., 145 F.3d 616, 619 (3d Cir. 1998).

While Holland did not involve an appeal from a decision of a court within the Third Circuit, it did affirm the practice of courts within this circuit of granting equitable tolling in cases where the above-mentioned conditions have been met.  See, e.g., LaCava v. Kyler, 398 F.3d 271, 275 – 76 (3d Cir. 2005).  Importantly, the Court of Appeals for the Third Circuit has emphasized that "[e]quitable tolling is appropriate when 'the principles of equity would make the rigid application of a limitation period unfair[.]'"  Id. at 275 (quoting Miller, 145 F.3d at 618).  Additionally, it should be applied only where it is "demanded by sound legal principles as well as the interests of justice."  LaCava, 398 F.3d at 275 (internal quotes and citations omitted).

The undersigned does not contest the Superior Court's interpretation of Pennsylvania law, nor the circumstances under which a PCRA petition is properly filed.  However, it is clear from the record that there was, at some point in time, some confusion in the Court of Common Pleas of Fayette County, if not within the Courts of Pennsylvania as a whole, regarding whether a trial court could maintain jurisdiction over a PCRA petition when a habeas petition was pending in the federal courts.  This is evidenced not only by the erroneous dismissal of Petitioner's second PCRA petition by Judge Franks, see (ECF Nos. 21-11 and 21-12), but also by the finding by both Judge Franks, and later by Judge Feudale, that the PCRA III petition was timely filed.  As best as can be determined from the record, this confusion appears to have begun with the Pennsylvania Supreme Court's holding in Commonwealth v. Lark, 746 A.2d 585 (Pa. 2000).  This case was decided on February 23, 2000 – just six months prior to the dismissal of PCRA II.  It involved a petitioner for state court post-conviction relief who, during his appeal

from the denial of his petition by the trial court, discovered new evidence to support his claims. Id. at 586 – 87. That petitioner moved for his case to be remanded to the trial court to address this evidence, but the Supreme Court denied this motion, and ultimately denied relief. That petitioner then filed a second PCRA petition with the trial court, which was dismissed as untimely. On appeal, the Supreme Court of Pennsylvania held that this had been improper for the following reasons. First, the trial court could not have jurisdiction of that petitioner's case at the time of discovery of his new evidence because his initial appeal was still pending at the time. Id. at 588. Second, that court determined that the 60-day period of time for asserting claims based on new evidence discovered under these circumstances began to run on the date of the order dismissing the initial appeal "because this is the first 'date the claim could have been presented.'" Id. (quoting 42 Pa. Cons. Stat. Ann. § 9545(b)(2)).

While it is clear, in hindsight, that the rule in Lark does not apply to habeas petitions, it is evident from the record that no such clarity existed at the time that Petitioner discovered the evidence in group three in May and July of 2000. This is demonstrated most poignantly by the fact that Judge Franks, then President Judge of the Court of Common Pleas of Fayette County, dismissed Petitioner's second PCRA petition based on an erroneous determination that he lacked jurisdiction to adjudicate it. See (ECF Nos. 21-11 and 21-12). Second, Petitioner argues that both Judge Franks, and later, Judge Feudale, held that his third PCRA petition – filed on March 21, 2001, was timely. Third, in addition to the orders of these two jurists, the record indicates that at least two additional PCRA petitions had been dismissed for the same reasons by the courts of Pennsylvania. See, e.g., Commonwealth v. Whitney, 817 A.2d 473 (Pa. 2003); see also Commonwealth v. Wharton, 835 A.2d 1273 (Pa. 2003). The Supreme Court of Pennsylvania did

not clarify this issue until March 5, 2003, when it held that parallel federal habeas petition did not invoke the rule in Lark. Whitney, 817 A.2d at 474. However, this holding came more than two years after Petitioner had filed PCRA III.

The Superior Court was unswayed by this reasoning when it determined that Petitioner's third PCRA petition was not timely filed under Pennsylvania law. Nevertheless, given the circumstances faced by Petitioner, including his reliance on the orders of the state trial court, the undersigned finds that the interests of justice weigh in favor of granting some period of equitable tolling.

Additionally, this Court finds marked parallels between this case and Slutzker v. Johnson, 393 F.3d 373 (3d Cir. 2004).[20] Slutzker involved a petition for writ of habeas corpus that had been filed on December 1, 1999. Id. at 377. On September 11, 2001, the petitioner in that case received previously undisclosed evidence in response to a subpoena. Id. at 377 – 78. On January 10, 2003, that petitioner filed an amended petition, which was granted in part, based on this previously undisclosed evidence. Id. at 378. His newly-discovered evidence was never presented to the state courts. The respondents appealed, arguing procedural default.

In analyzing that case, the court of appeals recognized that, given the state of the law at that time, the petitioner had been faced with four options, none of which were particularly appealing. First, he could have filed a new state petition with respect to his new evidence. However, given the state of the law at that time, it was likely that his then-pending habeas petition would have been dismissed without prejudice, rendering all of his other claims untimely

_____

[20] Slutzker dealt with the issue of procedural exhaustion, and not equitable tolling. However, it is illustrative of some of the lack of clarity in the law that faced Petitioner as he attempted to determine the proper manner to proceed with his claims based on his newly discovered evidence.

under AEDPA's statute of limitations.  Id. at 382.   That petitioner also could have requested that the habeas court stay his petition pending the resolution of his second state court petition, but "in the fall of 2001 there was significant doubt that he would have received [a stay], or that if he did it would be upheld on appeal."  Id.  It was not until 2004 when the Court of Appeals for the Third Circuit recognized that this "stay and abey" possibility was proper under these circumstances.  See Crews v. Horn, 360 F.3d 146, 151 – 52 (3d Cir. 2004).

Third, that petitioner could have attempted to present parallel petitions for relief – one in the state courts, and one in the federal courts.  However, the danger with that was that, as his unexhausted claims were based on federal law, if they were denied by the PCRA court, any attempt to introduce them in a later habeas petition would have made them "second or successive," and exposed them to the harsh standard of § 2244(b)(2).  Slutzker, at 384; see also Part V, infra.  Finally, the petitioner could have done what he ultimately chose to do – forego any attempt at state court exhaustion.  Weighing these unattractive possibilities, the court of appeals determined that that petitioner had demonstrated the necessary "cause" to overcome procedural default in the state court, and ultimately affirmed the lower court's grant of the writ.  Id. at 390.

The situation faced by Petitioner in 2000 when he discovered the evidence in group three obviously parallels that faced by the petitioner in Slutzker.  Indeed, when he discovered the evidence in question in 2000, not only was he presented with the untenable choices and unclear state of the law that confronted the petitioner in Slutzker, he also faced the added complication of his habeas petition being on appeal at the time.  Petitioner ultimately chose not to risk dismissal due to procedural default and attempted to exhaust his claims based on this evidence in state

court.  He also relied on the orders of Judge Franks and Judge Feudale with respect to the timeliness of his PCRA III petition.[21]

Once the third PCRA proceedings were underway, it would have been absurd for Petitioner to challenge the rulings of the PCRA III trial judges that his claims were timely filed, and this Court will not fault him for not doing so.  Additionally, there was recognized uncertainty in the law in 2000.  As such, it is apparent that "sound legal principles as well as the interests of justice" demand the tolling of the statute of limitations.  LaCava, 398 F.3d at 275 (internal quotes and citations omitted).  Upon the discovery of this evidence during the pendency of his appeal in 2000, Petitioner's position can be described as nothing less than untenable.  Not only did Petitioner face a recognized "grave risk" of defaulting his claims during this period of time due to then-existing uncertainty in the law, see Slutzker, 393 F.3d at 383 – 84, but his attempts to file petitions in state courts for relief based on this evidence were effectively stymied by those courts themselves.  Given the general diligence exhibited by Petitioner throughout this ordeal, this Court concludes that equitable tolling of his claims from August 24, 2000 – the date that his second PCRA petition was dismissed – until February 8, 2007 – the date of the Pennsylvania Supreme Court's denial of allocator – is appropriate.  This sets back the statute of limitations clock for evidence in group three by 2359 days.  As such, the new calculation with respect to the

---

[21] The period of time from the date of discovery of this evidence on May 2, 2000, and July 27, 2000, to the date of filing of the initial PCRA III petition on March 21, 2001, was well less than a year.  This Court notes that, had Judge Franks dismissed that petition with the same speed with which he dismissed the PCRA II petition, Petitioner would still have had several weeks during which he could have filed a second habeas petition.

Bates report is 414 days[22] – well outside the statute of limitations.  The new calculation for the remaining evidence – i.e., the Goodwin/Powell report, the Powell addendum, the Mangiacarne/Carbone report, and the Dunkard/Proud report, and the Kinch report – is 340 days.  Thus, five out of the six pieces of evidence in this group survive the statute of limitations analysis when equitable tolling is applied.

### 3.  Exhaustion

Now that it is clear what evidence is timely under the AEDPA, it is next necessary to determine whether Petitioner's claims have been adequately exhausted in the state courts and, if not, whether the circumstances of his case are sufficient to excuse his procedural default.

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief.  To comply with the exhaustion requirement, a state prisoner first must have fairly presented his constitutional and federal law issues to the state courts through direct appeal, collateral review, state habeas proceedings, mandamus proceedings, or other available procedures for judicial review.  See, e.g., Castille v. Peoples, 489 U.S. 346, 351 (1989); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996), abrogated on other grounds by Beard v. Kindler, 130 S.Ct. 612, 618 (2009); Burkett v. Love, 89 F.3d 135, 137 (3d Cir. 1996).  Moreover, a petitioner must present every claim raised in the federal petition to the state's trial court, intermediate appellate court, and highest court before exhaustion will be considered satisfied.  O'Sullivan v. Boerckel, 526 U.S.

---

[22] Even if this Court were persuaded to equitably toll the period of time that the pro se PCRA petition was pending, plus the thirty days allowed to file appeal, the statute of limitations clock was running for 377 days prior to the filing of the instant habeas petition.  As a result, the Bates report clearly is untimely under § 2244(d).

838, 845 (1999).  The petitioner has the burden of establishing that the exhaustion requirement

has been met.  Ross v. Petsock, 868 F.2d 639, 643 (3d Cir. 1989); O'Halloran v. Ryan, 835 F.2d

506, 508 (3d Cir. 1987).

Exhaustion is not a jurisdictional limitation, however, and federal courts may review the

merits of a state petitioner's claims prior to exhaustion when no appropriate state remedy exists.

Christy v. Horn, 115 F.3d 201, 206 (3d Cir. 1997); Doctor, 96 F.3d at 681; Carter v. Vaughn, 62

F.3d 591, 594 (3d Cir. 1995).  A petitioner shall not be deemed to have exhausted state remedies,

however, if he has the right to raise his claims by any available state procedure.  28 U.S.C. §

2254(c).

As is described in Part I.C., supra, it is clear that Petitioner included all of the

constitutional claims raised in the instant petition in PCRA III.  As such, this Court concludes

that Petitioner succeeded in exhausting the remedies available to him in the courts of

Pennsylvania.


### 4.  State Court Procedural Default

Beyond questions of exhaustion, a federal court may be precluded from reviewing claims

under the "procedural default doctrine."  Gray v. Netherland, 518 U.S. 152, 162 (1996); Coleman

v. Thompson, 501 U.S. 722, 732 (1991); Doctor, 96 F.3d at 678; Sistrunk v. Vaughn, 96 F.3d

666, 675 (3d Cir. 1996).   Like the exhaustion requirement, the procedural default doctrine was

developed to promote our dual judicial system and, in turn, it is based upon the "independent and

adequate state law grounds" doctrine, which dictates that federal courts will not review a state

court decision involving a question of federal law if the state court decision is based ons law that

is "independent" of the federal question and "adequate" to support the judgment. <u>Coleman</u>, 501 U.S. at 750.

The United States Supreme Court has held that where a petitioner has to follow state procedure within the required time period, the "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Id.</u> at 750; <u>see also</u> <u>Wainwright v. Sykes</u>, 433 U.S. 72, 86 – 87 (1977) (failure to follow state's procedural rules results in procedural default, which bars federal review of petitioner's claims unless he can show cause and prejudice); <u>Hull v. Freeman</u>, 991 F.2d 86, 90 – 91 (3d Cir. 1993) (same). The Court in <u>Coleman</u> further stated that it recognized "the important interest in finality served by state procedural rules and the significant harm to the states that results from the failure of federal courts to respect them." 501 U.S. at 750.

Finally, the United States Court of Appeals for the Third Circuit has held that a petition containing exhausted and unexhausted but procedurally barred claims is not a mixed petition requiring dismissal under <u>Rose v. Lundy</u>, 455 U.S. 509 (1982). <u>See</u> <u>Wenger v. Frank</u>, 266 F.3d 218, 227 – 28 (3d Cir. 2001). Instead, the court of appeals instructs that a district court should review the merits of the exhausted claims, but must not decide the merits of the claims that are barred under the procedural default doctrine. <u>Id.</u> at 228.

In the case at bar, there is no question that the evidence that was discovered during the course of the third PCRA proceedings was properly filed and adjudicated under Pennsylvania law. As such, it is clear that no procedural default took place with respect to it. However, the

evidence that was discovered during the pendency of Petitioner's first habeas appeal was found

to have been procedurally barred by the Pennsylvania Superior Court. Accordingly, this

evidence must be examined further in order to determine whether it may also be considered,

properly, by this Court.

A state's procedural rules are entitled to deference by federal courts; a petitioner's

violation of a state procedural rule may constitute an independent and adequate state law ground

for denial of federal review of habeas claims under the procedural default doctrine. Sistrunk, 96

F.3d at 673. Moreover, violations of a state's procedural rules may constitute an independent

and adequate state ground sufficient to invoke the procedural default doctrine even where no

state court explicitly has concluded that a petitioner is procedurally barred from raising his

claims. Glass v. Vaughn, 65 F.3d 13, 15 (3d Cir. 1995), cert. denied, 516 U.S. 1151 (1996);

Carter, 62 F.3d at 595. The procedural default doctrine applies only when a state procedural rule

is "'consistently or regularly applied.'" Banks v. Horn, 126 F.3d 206, 211 (3d Cir. 1997)

(quoting Johnson v. Mississippi, 486 U.S. 578, 588 – 89 (1988)); see also Doctor, 96 F.3d at 684

(the state rule must be firmly established and regularly followed before it can be considered an

independent and adequate state law ground sufficient to foreclose federal court review under the

procedural default doctrine).

The courts of the Third Circuit have long treated Pennsylvania's requirement that a

PCRA petition be filed within 60 days of the discovery of new evidence as clearly established

and consistently applied for the purposes of a federal habeas petition. See, e.g., Lines v. Larkins,

208 F.3d 153, 165 - 166 (3d Cir. 2000). Respondents rely on this assessment as support for their

argument that Petitioner's claims are procedurally defaulted under state law. (ECF No. 14 at 24

– 25).  Indeed, in interpreting § 2244(d), the Supreme Court has held that a petition seeking state-law collateral relief from a criminal conviction that is untimely-filed, regardless of the form of the time limits, is not properly filed under the meaning of the AEDPA.  <u>Pace</u>, 544 U.S. at 417.  Here, the evidence that was discovered during the pendency of the appeal from the dismissal of Petitioner's first habeas petition was clearly filed outside of the 60-day window allowed by the Pennsylvania Post-Conviction Relief Act.  Consequently, as the Superior Court recognized, Petitioner's claims are procedurally defaulted.  As such, in order to proceed on his claims based on this evidence, Petitioner must demonstrate the existence of grounds to excuse this default.

A petitioner whose constitutional claims have not been addressed on the merits due to procedural default can overcome the default, thereby allowing federal court review, if he or she can demonstrate either: (1) "cause" for the default and "actual prejudice" as a result of the alleged violation of federal law; or (2) failure to consider the claims will result in a "fundamental miscarriage of justice."  <u>Coleman</u>, 501 U.S. at 750; <u>Carter</u>, 62 F.3d at 595.

The Supreme Court has defined "cause" as "some objective factor external to the defense."  <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).  "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or . . . 'some interference by officials'" are two examples, but not an exhaustive list.  <u>Id.</u> (citing <u>Reed v. Ross</u>, 468 U.S. 1, 16 (1984); quoting <u>Brown v. Allen</u>, 344 U.S. 443, 486 (1953)).  In the context of a <u>Brady</u> violation, a petitioner may establish "'cause' when the reason for his failure to develop the facts in state-court proceedings was the State's suppression of the relevant evidence. . . ."  <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004); <u>accord</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 283 (1999).  The test for "prejudice" in the context of a <u>Brady</u> claim is identical to the "materiality" prong of the <u>Brady</u>

analysis.  <u>Strickler</u>, 527 U.S. at 282; <u>see</u> <u>also</u> <u>Slutzker</u>, 393 F.3d at 385 – 86; <u>Brady</u>, 373 U.S. at 87.

Ultimately, it is unnecessary to engage in a "cause and prejudice" analysis of Plaintiff's claims, as he so clearly qualifies for the second exception to the procedural default rule – *i.e.*, failing to allow his claims to proceed would result in a fundamental miscarriage of justice.  <u>See</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 320 – 22 (1995) (decided in the context of successive petitions). To show a fundamental miscarriage of justice, the United States Supreme Court requires a petitioner to demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  <u>Id.</u> at 321 (quoting <u>Murray</u>, 477 U.S. at 496).  Under this standard, a petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."  <u>Schlup</u>, 513 U.S at 324.  Once such evidence is presented, a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  <u>Id.</u> at 327.

In Part V of this opinion, <u>infra</u>, this Court holds that Petitioner has satisfied the standard for relief under a second or successive habeas petition – namely, that he has show by "clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(2)(B)(ii).  This standard is, by its very nature, higher than that which is necessary to avoid procedural default under <u>Schlup</u>. <u>See</u> 513 U.S. at 327 – 28.  Accordingly, this Court finds that Petitioner has met this burden to establish that failure to review his claims based on all evidence that is properly before this Court

would result in a miscarriage of justice, and thus will excuse his procedural default in the state court.

As a result of the above analysis, the undersigned concludes that the following pieces of evidence, and the claims on which they are based, are properly before this Court: (1) the Veil/Mangello report; (2) the Madden/Lucy report; (3) the Goodwin/Powell report; (4) the Powell addendum; (5) the Mangiacarne/Carbone report; (6) the Kinch report listing physical evidence taken from the scene of the murders; and (7) the Dunkard/Proud report.

## IV. MERITS

At the conclusion of its thorough analysis of Petitioner's case, The PCRA III trial court found that Petitioner's convictions were fundamentally unfair "without any doubt or question." PCRA III Trial Ct. Op. at 108. Judge Feudale went on to make the following observation:

> While we decline to speculate as to the issue of innocence (nor is it within the court's prerogative to so opine) we rely on our findings of fact and conclusions of law to state without equivocation, that [Petitioner] was wrongly convicted because of patent and ongoing prosecutorial misconduct involving the violation of the Constitution of the United States, the Pennsylvania Constitution and the various cases cited. The prosecutorial misconduct so undermined the truth determining process, that no reliable adjudication of guilt or innocence could have taken place in the 1983 mistrial, the second trial resulting in conviction in 1986; nor was there an informed and fair adjudication in the [PCRA I] proceeding. Similarly, due to prosecutorial acts of misconduct, omission and/or commission, we find that the 11 items of allegedly exculpatory evidence (all of which were acknowledged by prosecutors/judges Solomon and Warman and former PCRA Judge Franks as being discoverable) which were discovered and first became available to the defense in 2001, would have changed the outcome of the trial if such had been introduced.

-45-

Id.  Additionally, the PCRA III trial court determined that the circumstances of Petitioner's case were so egregious – describing the actions of the prosecution as "anathema to our most basic vision of the role of the Commonwealth in the criminal process" – that it conditionally barred his retrial pursuant to Pennsylvania constitutional law.  Id. at 114; see also Commonwealth v. Smith, 615 A.2d 321 (Pa. 1992).

Despite the damning conclusions of the PCRA III trial court, the Pennsylvania Superior Court reversed its grant of relief based on procedural issues that arose purely as a matter of Pennsylvania law.  However, the Superior Court also, in the alternative, addressed Petitioner's claims on their merits, and found the evidence that was suppressed by the Commonwealth not to be material.  Consequently, the Superior Court found that the suppression of this evidence did not constitute a violation of the Fourteenth Amendment, as per the Supreme Court's holding in Brady.  In light of that court's decision to address Petitioner's constitutional claims on their merits, this Court's ability to grant the writ is severely curtailed by the AEDPA's strict standards.

A.      **Standard of Review under § 2254**

28 U.S.C. § 2254 allows a person in custody due to the judgment of a state court to seek a writ of habeas corpus based "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  See 28 U.S.C. § 2254(a).  In the case sub judice, Petitioner alleges that the prosecution in his 1983 and 1986 murder trials, as well as during his first PCRA proceedings, unlawfully suppressed exculpatory evidence, thus violating his rights

under the Sixth Amendment to the Constitution of the United States, as described by the United States Supreme Court.[23]  See Brady, 373 U.S. at 83.

In describing the role of federal habeas proceedings, the Supreme Court of the United States noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence. . . .  The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials.

Barefoot v. Estelle, 463 U.S. 880, 887 (1983), superseded by statute on other grounds as recognized in Slack v. McDaniel, 529 U.S. 473, 480 – 81 (2000).

The AEDPA has further "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002) (citing Williams v. Taylor, 529 U.S. 362, 403-04 (2000)).  Amended § 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations and provides, in relevant part, as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

---

[23] The Supreme Court's holding in Brady tied the requirement that a prosecutor turn over favorable evidence to a criminal defendant to the Due Process Clause of the Fourteenth Amendment, and not to the Sixth Amendment, as Petitioner contends.  See Brady v. Maryland, 373 U.S. 83, 86 (1963).

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004) (quoting Williams, 529 U.S. at 405 – 06). Few state court decisions will be "contrary to" Supreme Court precedent. "'[C]learly established Federal law' should be determined as of the date of the relevant state-court decision." Greene v. Palakovich, 606 F.3d 85, 87 (3d Cir. 2010).

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent.

> A state-court decision "involve[s] an unreasonable application" of clearly established federal law if the state court (1) "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case"; or (2) "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."

Blackwell, 387 F.3d at 234 (quoting Williams, 529 U.S. at 407). It is important to note that this standard is different from finding that the state court applied clearly established federal law

*incorrectly*. "'The unreasonable application test is an objective one – a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly.'" Lambert v. Beard, 633 F.3d 126, 133 (2011) (quoting Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005)). Instead, the application of the law by the state court must also be *unreasonable*. Beard, 633 F.3d at 133. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S.Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). If a state trial court and appellate court make conflicting factual findings, the habeas court must defer to the findings of the higher court – regardless of the propriety of those findings under state law – unless they are rebutted by clear and convincing evidence. See Rolan v. Vaughn, 445 F.3d 671, 680 (3d Cir. 2006).

Petitioner's claims will be reviewed in accordance with the standards set forth above.

## B. The **Brady** Standard

As the Court of Appeals has recently reaffirmed, "[a] Brady violation occurs if: (1) the evidence at issue is favorable to the accused, because either exculpatory or impeaching;[24] (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" Breakiron v. Horn, 642 F.3d 126, 133 (3d Cir. 2011) (internal citations omitted).

---

[24] At the time of Petitioner's 1986 trial it had been established that impeachment evidence fell within the rule in Brady. See, e.g., United States v. Bagley, 473 U.S. 667 (1985).

The requirement that the prosecution disclose such information extends not only to information that is actually known to the prosecutors, but also to "all information in the possession of the prosecutor's office, the police, and others acting on behalf of the prosecution." Wilson v. Beard, 589 F.3d 651, 659 (3d Cir. 2009) (citing Youngblood v. West Virginia, 547 U.S. 867, 869 – 70 (2006)); see also Kyles v. Whitley, 514 U.S. 419, 437 – 38 (1995). Willful or morally culpable suppression of Brady evidence is not necessary for relief to be granted. The Supreme Court has long recognized that "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." United States v. Agurs, 427 U.S. 97, 110 (1976). Even a criminal defendant's failure to request favorable evidence does not abrogate the prosecution's disclosure obligations. Kyles, 514 U.S. at 432 – 33. "[A] defendant's failure to request favorable evidence [does] not leave the Government free of all obligation[,]" and a Brady violation might arise even "where the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way." Id. at 433 (citing Agurs, 427 U.S. at 108).

"The prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20th-century strictures against misrepresentation and is of course most prominently associated with [the Supreme Court's] decision in Brady v. Maryland, 373 U.S. 83, (1963)." Kyles, 514 U.S. at 432 (citations omitted). The Court in Brady held "'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" Id. (quoting Brady, 373 U.S. at 87) (citations omitted).

"Impeachment evidence . . . as well as exculpatory evidence, falls within the <u>Brady</u> rule.[25]" <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985) (citing <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972)). "Such evidence is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." <u>Id.</u> (quoting <u>Brady</u>, 373 U.S. at 87; citing <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959)) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend"). "<u>Brady</u> . . . envisions two requirements for overturning a verdict: (1) that evidence in the possession of the government was actually suppressed, and (2) that the suppressed evidence was material." <u>Slutzker</u>, 393 F.3d at 386.

The "materiality" of suppressed evidence must be determined collectively, and not item-by-item. <u>Kyles</u>, 514 U.S. at 436. Additionally, the "materiality" test under <u>Brady</u> does not require a petitioner to show that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." <u>Id.</u> at 434 – 35. Instead, evidence is "material" if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Id.</u> at 435 (footnote omitted). Indeed, a <u>Brady</u> violation may occur even if the record contains adequate evidence to convict after the disclosure of favorable evidence. <u>Id.</u> at 435 n.8. "'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of

---

[25] The Supreme Court has explicitly held that impeachment evidence need not also be exculpatory in order to be favorable, and thus discoverable, under <u>Brady</u>. <u>Strickler v. Greene</u>, 527 U.S. 263, 282 n.21 (1999).

confidence.'" Beard, 633 F.3d at 133 (quoting Kyles, 514 U.S. at 434). "'[C]onfidence in the outcome is particularly doubtful when the withheld evidence impeaches a witness whose testimony is uncorroborated and essential to the conviction.'" Beard, 633 F.3d at 134 n.3 (quoting Norton v. Spencer, 351 F.3d 1, 9 (1st Cir. 2003)).

The prosecution's obligation to disclose Brady materials applies even to evidence that appears redundant. "Redundancy may be factored into the materiality analysis, but it does not excuse disclosure obligations." Monroe v. Angelone, 323 F.3d 286, 301 (4th Cir. 2003). Finally, the determination of materiality of evidence under Brady is a mixed question of law and fact that is not subject to the presumption of correctness if § 2254(e)(1). Simmons v. Beard, 590 F.3d 223, 233 n.5 (3d Cir. 2009) (internal quotes and citations omitted).


## C.     Application


### 1. Factual Findings by the Pennsylvania Superior Court

It is disturbing to this Court that, in its rejection of the factual findings and credibility determinations of the PCRA III trial court, despite support existing for them on the record, the Superior Court apparently overstepped the bounds of the applicable standard of review of factual and credibility determinations for this type of proceeding. See Commonwealth v. Lambert, 765 A.2d 306, 323 (Pa. Super. Ct. 2000); see also Commonwealth v. Carr, 768 A.2d 1164, 1167 (Pa. Super. Ct. 2001). Be that as it may, this Court recognizes that it cannot merely set aside the Superior Court's seemingly improper fact and credibility determinations for those of the trial court. Instead, the Court of Appeals for the Third Circuit instructs that this Court must give

deference to those findings of the Superior Court – unless, pursuant to 28 U.S.C. § 2254(d)(2), they are found to be unreasonable in light of the evidence presented in the state court proceeding. See Rolan, 445 F.3d at 680.  In the instant case, Petitioner has not met this standard with respect to the factual findings and credibility determinations made by the Superior Court.  Accordingly, § 2254(d)(2) does not provide a basis for the granting of the writ.

### 2.   Contrary to or an Unreasonable Application of Clearly Established Federal Law

As an initial matter, this Court notes that, in its opinion, the Superior Court itself agreed that Petitioner had presented cognizable Brady claims in his third PCRA petition – but that they were merely untimely.  PCRA III Ap. Ct. Op. at 43.  Additionally, the standard of review articulated by the Superior Court for a Brady claim was that Petitioner "must show that these new facts constitute 'exculpatory evidence' that 'would have changed the outcome of the trial had it been introduced.'" Id. at 44 (internal quotations omitted).  This standard fails to include the fact that evidence that is *favorable* to the petitioner – such as impeachment evidence – also may not be suppressed by the prosecution under Brady.  Additionally, a showing of materiality does not require that petitioner demonstrate that his newly-discovered evidence "would have changed the outcome" of his criminal trial.  Instead, he must show that there is a "reasonable probability" – *i.e.* enough of a probability to undermine the confidence in the verdict – that it might have done so.  Bagley, 473 U.S. at 682.  While the Superior Court did identify this proper test for materiality at a later point in its opinion, PCRA III Ap. Ct. Op. at 45, to the extent that it relied on the above heightened standard, its application of clearly established federal law, as determined by the Supreme Court of the United States, was unquestionably unreasonable.

The next task before this Court is to review Petitioner's surviving <u>Brady</u> claims. This Court first examines the Veil/Mangello report and the Madden/Lucy report. PCRA III Ap. Ct. Op. at 73 – 74; 111 – 12. These two related documents are reports, written by State Police officers, concerning the content of interviews conducted by those officers. The Veil/Mangello report is dated June 23, 1986, and contains a summary of a statement made by Mangello, then an inmate at Western Penitentiary, to Veil, on September 17, 1986.[26] In this report, Mangello alleges that Lucy, while in prison, had informed Mangello that his car – a green Chevrolet or Pontiac – had been used in the murders at Bear Rocks.[27] <u>See</u> (ECF No. 4-1 at 16). Mangello went on to allege that he had been told by Lucy that Scaglione had paid him and another individual – who Mangello refused to name without a reduction in his sentence – a sum of $5,000 to commit the killings. <u>Id.</u> According to this story, Scaglione had remained in the car while the murders were taking place. <u>Id.</u>

Presumably in an effort to follow-up on these allegations, Madden interviewed Lucy in prison on October 15, 1986.[28] <u>Id.</u> at 17. When confronted with Mangello's story, Lucy admitted to having spent time as his cellmate, but denied involvement in the Bear Rocks murders. <u>Id.</u> He

---

[26] This Court notes the discrepancy in those two dates. It further notes that both dates occurred before Petitioner's second homicide trial, which lasted from November 20 to November 26, 1986.

[27] Mangiello indicated that his information pertained to murders that took place at Bear Rocks in "'1972-1973.'" (ECF No. 4-1 at 16). The murders for which Petitioner was convicted took place in 1977.

[28] The Superior Court found that the Madden/Lucy report was referenced in the PCRA II petition filed on July 27, 2000, as well as the PCRA III petition filed on March 21, 2001. <u>Id.</u> at 112. However, a review of those petitions, as well as the related documents on the record before this Court, does not reveal the basis for this finding by the Superior Court. <u>See</u> <u>generally</u>, (ECF Nos. 21-10 and 21-13). Be that as it may, assuming that it was part of the second PCRA petition, this report is still properly before this court for the reasons stated above in Part III, <u>supra</u>.

also denied having ever owned a green Chevrolet or Pontiac.  Id.  He stated that he knew

Scaglione – but only from prison.  Id.  Lucy then alleged that Mangello himself had been at Bear

Rocks, and had witnessed the shootings.  Id.  Finally, Lucy opined that Mangello made his

earlier statements to police only to reduce his own sentence.  Id.

     In addressing these reports, the Superior Court concluded that they were in no way

exculpatory to Petitioner, as the reports could be used, at best, only to challenge Bowen's

recollection of the details of the getaway car, which was not material for the purposes of a Brady

claim.  PCRA III Ap. Ct. Op. at 74.  Additionally, the statements do not conclusively exclude

Petitioner from the crimes.  Id.

     The Superior Court's application of clearly established federal law, as determined by the

Supreme Court of the United States, was unreasonable with respect to these pieces of evidence.

First, these statements not only call into question Bowen's recollection of the car that was used

on the night of the murders, they also include the addition of Mangiello or Lucy to the party that

committed them, and whether Scaglione was in the cabin when they were happening –

something that, if believed, would provide an additional method for calling into question the

veracity of Bowen's testimony.

     However, despite the favorable nature of these statements, they are unsworn,

contradictory, and, as the Superior Court recognized, do not preclude Petitioner's involvement in

the crimes.  While this is a close call, it appears that, in and of themselves, the exclusion of these

two reports is not enough to undermine the confidence in the verdict against Petitioner at his trial

in 1986.  Accordingly, when analyzed in isolation without the other evidence properly before this

Court, these documents are not material.  Be that as it may, the favorable nature of this evidence

compels this Court, under the Supreme Court's clear holding in <u>Kyles</u>, to analyze their materiality in conjunction with the other <u>Brady</u> evidence properly adduced by Petitioner. <u>Kyles</u>, 514 U.S. at 436.

Next, this Court addresses the Goodwin/Powell report and the Powell addendum. PCRA III Ap. Ct. Op. at 71 – 72; (ECF No. 4-1 at 8 – 9). These two pieces of evidence contain essentially the same information. The report and addendum both indicate that Deputy Coroner Powell allegedly informed Trooper Goodwin that the anal sex suffered by the victims occurred more than 24 hours prior to their deaths. (ECF No. 4-1 at 8 – 9). Such a revelation, if true, would conflict with Bowen's testimony that he witnessed Petitioner and Scaglione rape the victims. However, on August 13, 2003, during a hearing convened by the PCRA III trial court, Powell denied making these statements. PCRA III Hearing Tr. of Aug. 13, 2003, at 196 – 97 (ECF No. 21-24 at 10 – 11). Additionally, Powell further testified at the hearing that he was trained as a mortician, and was not qualified to offer such an opinion. PCRA III Hearing Tr. of Aug. 13, 2003, at 196 – 97 (ECF No. 21-24 at 10 – 11). Based on this testimony, the Superior Court determined that, at best, the report relayed an assumption by Powell, and that assumption – presumably based on the small amount of sperm collected from the victims' bodies – and was qualified due to the fact that Alford had defecated prior to his death. PCRA III Ap. Ct. Op. at 99 – 100. Appling its interpretation that evidence is only material if it "would have changed the outcome of the trial had it been introduced[,]" PCRA III Ap. Ct. Op. at 72, the Superior Court concluded that there was no possibility that this information would have changed the outcome of the 1986 trial, had it been introduced. <u>Id.</u>

Reviewing this evidence, it is clear that it is favorable to Petitioner because it contradicts Bowen's account of events on the night of the murders. Additionally, Bowen was the only "eye-witness" presented by the prosecution, and there was no physical evidence linking Petitioner to the crimes. This report, if credible, would do much to bolster Petitioner's claims.

However, as the Superior Court properly recognized, there are significant issues with the veracity of the ultimate conclusion made in the report. Powell was not qualified to make the statement, and could easily have been called by the prosecution to rebut it at the 1986 trial. See id. While it is true that these documents establish that, in December of 1977, *someone* thought that the victims had not been forced to endure anal intercourse immediately prior to their deaths. However, without knowing whether that individual was qualified to make such a statement, these documents, in and of themselves, are not sufficient to cause this Court to lose confidence in the 1986 trial court's verdict. However, given the favorable nature of this suppressed evidence, it is necessary to consider its potential effect on a trier of fact collectively with the other Brady material adduced by Petitioner.

Next, this Court examines the Mangiacarne/Carbone report. See PCRA III Ap. Ct. Op. at 67 – 71; see also (ECF No. 4-1 at 7). This document is a report written by Mangiacarne on December 16, 1980. It relates the contents of his interview of Carbone. It indicates that Carbone stated that, when she was 15 years old, her drug supplier, Urdzik, indicated that he witnessed Wiltrout murder Alford and Geirke in December of 1977 over a drug deal, and then dispose of the murder weapon in a lake. See (ECF No. 4-1 at 7). She alleged that Urdzik told her this only two weeks after the murders were committed. Id.

In analyzing this piece of evidence, the Superior Court reiterated its standard that Petitioner "must show that the new facts constitute exculpatory evidence that *would have changed the outcome of the trial if it had been introduced.*"  PCRA III Ap. Ct. Op. at 69 (emphasis added).  Without determining whether this piece of evidence was favorable to Plaintiff, the Superior Court recognized that it was inadmissible hearsay, and thus not likely to have been admitted by the judge during the 1986 trial.  Id. at 69.  Further, the trial court refused to allow testimony from Goodwin indicating that additional suspects had been investigated by the state police during the 1983 trial.  Id. at 69 – 70.  Finally, the Superior Court made the factual finding that Petitioner had been aware that Wiltrout had been a suspect as early as the 1983 trial. Indeed, Wiltrout had been called by the defense during the 1983 trial, but had invoked his Fifth Amendment right against self-incrimination.  Id. at 70.

For the reasons stated above, this heightened standard of materiality used by the Superior Court is an unreasonable interpretation of the clearly-established precedent of the United States Supreme Court.  This evidence clearly is favorable to Petitioner.  While it is undoubtedly hearsay, it contains the names of two individuals – Carbone and Urdzik – who could have provided valuable testimony or investigative leads supporting Petitioner's defense.  Additionally, if Urdzik had indeed witnessed Wiltrout murder Gierke and Alford in 1977, his testimony would not have been inadmissible hearsay, and would have, at the very least, cast doubts on the veracity of Bowen's testimony.  The suppression of this piece of evidence undermines this Court's confidence in the verdict at the 1986 trial.

Next, this Court turns its attention to the Kinch report Trooper Kinch's report.  PCRA III Ap. Ct. Op. at 83 – 84; see also (ECF No. 4-1 at 18).  This report lists various pieces of physical

evidence taken from the scene of the murders on December 2, 1977.  (ECF No. 4-1 at 18).  The PCRA III trial court ordered the evidence still in existence – which included rectal samples, nail scrapings, and clothing samples taken from the victims – to undergo DNA testing.  PCRA III Ap. Ct. Op. at 83, 113.  The test results were inconclusive, revealing only DNA of the victims, a male, or no results at all.  Id. at 113 – 15.  Noting that during the 1986 trial DNA testing was in its infancy, and had not been widely accepted by the courts, the Superior Court determined that this physical evidence, as well as the 2003 test results, were not exculpatory.  Id. at 83.

In Simmons, the court of appeals held that "negative" or "inconclusive" test results "may be exculpatory even when they do not provide definitive evidence on a particular issue."  590 F.3d at 237.  Neutral forensic evidence, "'may, because of its neutrality, tend to be favorable to the accused. While it does not by any means establish his absence from the scene of the crime, it does demonstrate that a number of factors which could link the defendant to the crime do not.'"  Id. (quoting Patler v. Slayton, 503 F.2d 472, 479 (4th Cir. 1974)).  In the case at bar, there is absolutely no physical evidence linking Petitioner to the scene of the crimes, and this dearth of evidence supports his position at trial that he was not present at Bear Rocks when Alford and Gierke were killed.  Thus, the existence of actual samples of physical evidence – inconclusive as they may be on the issue of Petitioner's guilt – are favorable to Petitioner under this jurisprudence.  While their materiality to his case, when viewed in a vacuum, may not be great, this court "must at least consider the potential effect of this evidence on the jury's verdict in combination with the other Brady material."  Simmons, 590 F.3d at 237.

Next, this Court addresses the Dunkard/Proud report.  PCRA III Ap. Ct. Op. at 84 – 87; see also (ECF No. 4-1 at 15).  In this report, Dunkard gives, inter alia, a summary of his

interview of Proud, a radio dispatcher for the Mt. Pleasant, Pennsylvania, Police Department. (ECF No. 4-1 at 15). Proud stated that, at 2:32 A.M. on December 2, 1977, she received a call from a telephone operator who told her that "'[a] man said he was shot and lives at 837 Alpine Rd., in Bear Rocks.'" Proud also indicated that she received a call at 2:50 A.M. from Bonnie Blackson, to report that she had found Alford, who was wounded and on her porch. Id. As the Superior Court noted, this report does not disclose the first caller, but the parties stipulated at the 1986 trial that type "O" blood was found on the telephone in Gierke's home, and that was Gierke's blood-type. 1986 Trial Tr. at 310. Additionally, Gierke's body was discovered lying near his telephone. PCRA III Ap. Ct. Op. at 84.

Petitioner argues that this report contradicts "Bowen's testimony that the 1st [sic] shot fired and taken by Gierke was in the head, later revealed in the autopsy to have been in the brain . . . ." (ECF No. 4 at 68). The Superior Court compared this argument to Bowen's testimony at the 1986 trial, finding that Bowen's testimony did not fit Petitioner's characterization. PCRA III Ap. Ct. Op. at 84 – 85. Instead, as an examination of the 1986 trial transcript demonstrates, Bowen stated the first shot hit Gierke "in the upper body . . . . Around that area – upper chest – head [sic]." 1986 Trial Tr. at 245. Additionally, Bowen testified that Gierke fell down "[j]ust about as so as he was hit . . . ." Id. at 246. Bowen then testified that he (Bowen) then turned toward the door. Id. Later, after he left the cabin, he heard more gunshots, but did not count them. Id. at 253.

The Superior Court next compared the contents of the Dunkard/Proud report to Gierke's autopsy report. PCRA III Ap. Ct. Op. at 85; see also (ECF No. 74). That report indicated that Gierke had suffered from (1) a gunshot wound to the chest, "penetrating the right lung,

diaphragm and lacerating the liver[;]" (2) a perforating gunshot wounds to the left forehand, left

large finger, and thumb; and (3) a gunshot wound to the head, perforating the brain, "probably

post mortem." (ECF No. 74 at 6). From this, the Superior Court concluded that neither Bowen's

testimony nor the autopsy ruled out the possibility that Geirke could have picked up his

telephone, dialed "0" and called for help before he lost consciousness, died, and then was shot in

his head, *post mortem*. PCRA III Ap. Ct. Op. at 85 – 86.

Nevertheless, despite this unfavorable analysis of Petitioner's argument, the Superior

Court further stated that they "agree[d] with [Petitioner] that this report ought to have been

turned over to the defense pursuant to <u>Brady</u> and that it might have proven useful in attempting

to impeach Bowen's testimony." <u>Id.</u> at 86. Inexplicably, however, that court then backtracked

from this conclusion, finding that, given the extent to which Bowen's testimony had been

impeached at trial, there was not a reasonable probability that the avenue of impeachment that

the disclosure of this report would have provided would have led to a different outcome at trial.

<u>Id.</u> Additionally, that court also concluded that, as the information in this report did not make

Bowen's recitation of the facts an impossibility, it did not warrant a new trial. <u>Id.</u> at 87.

It is well established that "'impeachment evidence, if cumulative of *similar* impeachment

evidence used at trial . . . is superfluous and therefore has little, if any, probative value.'" <u>Beard</u>,

633 F.3d at 133 (quoting <u>Conley v. United States</u>, 415 F.3d 183, 189 (1st Cir. 2005)) (emphasis

in original). The <u>Beard</u> court also noted that "[o]ther federal courts of appeals have echoed the

conclusion that additional, non-cumulative impeachment material implicates <u>Brady</u>. <u>Id.</u> at 135

(citing <u>United States v. Torres</u>, 569 F.3d 1277, 1284 (10th Cir. 2009) ("Merely because other

impeachment evidence was presented does not mean that additional impeachment evidence is

cumulative. . . .")).  New, dissimilar evidence may lead to new avenues of impeachment.  Beard,

633 F.3d at 134.  Indeed, especially in cases where the testimony of one witness plays a central

role to the prosecution's case against a criminal defendant, additional, non-cumulative

impeachment material may have the potential to be quite material under Brady.  Id. at 134 – 35.

As the Court of Appeals for the Third Circuit has recognized, "'[c]onfidence in the outcome is

particularly doubtful when the withheld evidence impeaches a witness whose testimony is

uncorroborated and essential to the conviction.'"  Id. at 134 n.3 (quoting Norton v. Spencer, 351

F.3d 1, 9 (1st Cir. 2003)).

      The Superior Court noted that Bowen had been impeached several ways during trial with

respect to the grant of immunity that he received, his extensive record of crimen falsi and other

crimes, having attempted suicide while in prison, and his numerous inconsistent statements made

to police during the investigations of the murders and during Scaglione's trial.  PCRA III Ap. Ct.

Op. at 86 – 87.  However, this method of impeachment made available through the

Dunkard/Proud report was new because it attacked the probability, if not the possibility, that

events could have occurred as Bowen described them in his testimony.  Such an attack also has

the potential to undermine Bowen's very credibility as a witness.  Thus, given the clearly

favorable nature of the report and the reliance placed by the prosecution on Bowen's purported

eye-witness testimony at the 1986 trial, this Court concludes that the effect of this piece of

evidence on a trier of fact must be considered, in concert with the other Brady material properly

adduced by Petitioner.

      Finally, this Court must address the cumulative materiality of the above favorable

evidence.  From the outset, the Superior Court analyzed the materiality of the Brady evidence

adduced by Petitioner individually, and without regard to the cumulative impact that evidence might have on a trier of fact.  At no point in its 119-page opinion did that court do so much as suggest that it would engage in an analysis of the materiality of the aggregate of this evidence.  This methodology was unreasonable in light of the Supreme Court's clear and unambiguous holding in <u>Kyles</u>, which mandates that the materiality of multiple pieces of suppressed evidence must be determined collectively.  514 U.S. at 436.

For the reasons stated above, this Court finds that the suppression of the Mangiacarne/Carbone report undermines the confidence in the verdict at the 1986 trial to a sufficient degree that it, in and of itself, warrants the grant of relief.  However, even if that were not the case, the seven pieces of favorable evidence discussed above are certainly enough, when viewed in their aggregate, to create a reasonable probability that, had they properly been disclosed to the defense, the outcome of the 1986 trial would have been different.  <u>See</u> <u>Simmons</u>, 590 F.3d at 238 – 39.

It is impossible to understate the importance of Bowen's testimony to the prosecution's case.  He provided the only purported eyewitness testimony of the murders at the 1986 re-trial.  Bowen's account of the murders was the only one presented to the trier of fact.  He described who participated in the crimes, the method of transportation to the crime scene, the timing of the victims' rapes with respect to the murders, the motivation for the murders, and the method and timing of the killings.  He even provided a story concerning what the three men did after the murders.

However, Bowen's story was constantly changing.  When he first contacted authorities in 1981, while in jail, he made no mention of having witnessed the murders.  He told authorities

only that he had heard from Scaglione that he had committed them.  PCRA III Trial Ct. Op. at 7

– 8; 1986 Trial Tr. at 234 – 35; 1983 Trial Tr. at 137 – 38.  He also made no mention of

Petitioner having been involved.  Id. at  7 – 8; see also 1986 Trial Tr. at 232 – 33; 1983 Trial Tr.

at 138.   In a later statement to police, he indicated that he had not entered Gierke's cabin, and he

did not witness the murders.  1986 Trial Tr. at 229, 235.  It was not until 1982 – almost five

years after the murders, and months after he initially spoke to police, that Bowen stated that he

had been in Gierke's house at the time of the murders.

 Bowen's credibility is further undermined by his extensive criminal record.  He was

impeached at the 1986 trial based on numerous crimen falsi and other crimes, as well as his grant

of immunity for his role in the crimes.   Indeed, given his multitude of credibility issues, it is a

wonder that the prosecution attempted to base a case around Bowen's testimony at all.

 The seven pieces of evidence, in their aggregate, provide additional, non-cumulative

methods to impeach Bowen's story.  First, the Mangiacarne/Carbone report provides

information, as well as the names of potential witnesses, who present a version of events at Bear

Rocks that is wholly inconsistent with Bowen's, and omits Petitioner's involvement entirely.[29]

The Veil/Mangiello report and the Madden/Lucy report provide similar evidence, albeit to a

lesser extent.  The Dunkard/Proud report, which the Superior Court  held should have been

disclosed to Petitioner at trial under Brady, calls into question the physical possibility of

Bowen's recitation of the events on the night of the murders.  Similarly, the Goodwin/Powell

---

[29] It also implicates Wiltrout – the former husband of Dahlmann, one of the witnesses who testified that Petitioner confessed to her in January of 1978.  1986 Trial Tr. at 155.  The record indicates that three of the four witnesses presented at the 1986 trial – Dahlmann, Lexa, and Furr – knew each other prior to their involvement in this case, and it appears that their stories related to the same night.  Id. at 279.  The fourth, Thomas, had heard Petitioner's alleged confession while Thomas was in jail for burglary.  Id. at 261 – 62.

report and the Powell addendum indicate that some unnamed person was of the opinion that Bowen's recitation of facts on that issue was incorrect. Finally, the neutral results of the DNA tests on the remaining evidence that was listed in the Kinch report would underscore to a trier of fact that physical evidence *did* exist, and none of it conclusively linked Petitioner to the crimes. Simmons, 590 F.3d at 236 – 37.

The combination of the above evidence calls into question the credibility of Bowen's recitation of facts to the point that one wonders whether he witnessed the murders at all. Additionally, the presentation of physical evidence that could show Petitioner's presence at the scene of the crime, but does not, not only impeaches Bowen's testimony, but independently supports the conclusion that he was not involved in the murders. As such, the aggregate effect of this evidence is enough to establish a reasonable probability that, had it properly been disclosed to Petitioner by the prosecution, it would have led to a different result at trial. The materiality of the aggregate of this evidence is undeniable. As such, Petitioner has met his burden to demonstrate that his 1986 criminal trial was constitutionally deficient. However, in spite of the appearance of the fact that Petitioner was denied a fair trial by the prosecution's unlawful suppression of favorable, material evidence, this is not enough to warrant the grant of relief. Instead, this Court must now examine whether Petitioner has met the AEDPA's high standard for second or successive petitions.

## V. SECOND OR SUCCESSIVE PETITIONS

In order for a Petitioner in a second or successive habeas petition to receive relief, his claims must rise to the following standard under the AEDPA.

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless--
>
> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2).

The AEDPA standard for determining whether a second or successive habeas petition may be allowed to proceed has been held to be a codification of the pre-AEDPA abuse of the writ doctrine. See, e.g., Benchoff v. Colleran, 404 F.3d 812, 817 – 19 (3d Cir. 2005); see also United States v. MacDonald, 641 F.3d 596, 610 – 11 (4th Cir. 2011). As such, it is proper to look back to those pre-AEDPA cases addressing the standard under which so-called "abusive petitions" were dealt, in order to determine what relief, if any, is ultimately available to Petitioner.

At the outset, it is important to note that the AEDPA second or successive petition standard, like the abuse of the writ doctrine's factual innocence test, is not a freestanding innocence claim to be used by a petitioner as a basis for the grant of relief. Rather it is a procedural "'gateway through which a habeas petitioner must pass to have his otherwise barred

constitutional claim considered on the merits.'" Schlup, 513 U.S. at 315 (quoting Herrera v. Collins, 506 U.S. 390, 404 (1993)).

In order to present a successful gateway claim of innocence, a petitioner must, as a threshold matter, "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Schlup, 513 U.S. at 324; see also Hubbard v. Pinchak, 378 F.3d 333, 340 – 41 (3d Cir. 2004) (holding that the Schlup standard for presenting a gateway innocence claim requires a petitioner to adduce new evidence that was unavailable at the time of trial). "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." Schlup, 513 U.S. at 316.

Once a petitioner has adduced new evidence of his or her innocence, the determination of whether a "reasonable factfinder would have found the applicant guilty of the underlying offense" – and thus, whether a petitioner can satisfy the AEDPA's procedural bar concerning second or successive petitions – must be made in light of *all* of the evidence available on the record. House v. Bell, 547 U.S. 518, 538 (2006); see also Hubbard, 378 F.3d at 340 – 41. This has been held explicitly to include "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" House, 547 U.S. at 538 (quoting Schlup, 513 U.S. at 327-28 (internal quotes omitted)); see also Goldblum v. Klem, 510 F.3d 204, 225 – 226 (3d Cir. 2007); see also MacDonald, 641 F.3d at 612 – 13. This also requires a court a give "due regard

to any unreliability of" the evidence where it may be warranted.  <u>Schlup</u>, 513 U.S. at 328

(internal quotes omitted).  The ultimate goal of a court weighing a gateway innocence claim is to

assess how properly instructed jurors would react to the newly supplemented record overall.

"Based on this total record, the court must make 'a probabilistic determination about what

reasonable, properly instructed jurors would do.'" <u>House</u>, 547 U.S. at 538, (quoting <u>Schlup</u>, 513

U.S. at 329).  "The court's function is not to make an independent factual determination about

what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors."

<u>House</u>, 547 U.S. at 538.

This is not to say that, upon reviewing the record as a whole, a petitioner must refute all

evidence that incriminates him.  Indeed, a "petitioner's showing of innocence is not insufficient

solely because the trial record contained sufficient evidence to support the jury's verdict."

<u>Schlup</u>, 513 U.S. at 331.  Instead, as "proof beyond a reasonable doubt marks the legal boundary

between guilt and innocence[,]" <u>id.</u> at 328, a court must make "a holistic judgment about all the

evidence . . .  and its likely effect on reasonable jurors applying the reasonable-doubt standard."

<u>House</u>, 547 U.S. at 539 (internal quotes and citations omitted).

In granting Petitioner's motion to file a second or successive petition with this Court, it

was necessary for the court of appeals to find that Petitioner had made a *prima facie* case that (1)

"the factual predicate for the claim could not have been discovered previously through the

exercise of due diligence;" and (2) "the facts underlying the claim, if proven and viewed in light

of the evidence as a whole, would be sufficient to establish by clear and convincing evidence

that, but for constitutional error, no reasonable factfinder would have found the applicant guilty

of the underlying offense."  <u>See</u> <u>Goldblum</u>, 510 F.3d at 216 – 17 (quoting 28 U.S.C. §

2244(b)(2)(B)).  However, the court of appeals has been quite explicit, both in its prior case law and in its order transferring this specific case to this Court, that such a finding does not bind this Court, or in any way obviate this Court's duty to adjudicate Petitioner's claims.  Goldblum, 510 F.3d at 219; see also (ECF No. 58 at 1).

This Court concludes that, by adducing the seven pieces of Brady materials that are properly before this Court, Petitioner has met his burden to present newly-discovered evidence of his innocence.  The record contains clear and convincing evidence that this Brady material was not available to Petitioner at his 1986 trial.  Instead, as described above, it was suppressed by state actors until 2000 and 2003.  Additionally, for the reasons stated above, this evidence effectively undermines the credibility of Bowen's testimony – which was the only direct evidence possessed by the prosecution tying Petitioner to the murders – to the point that no reasonable factfinder could credit it as true.[30]  Additionally, there is no physical evidence in the

---

[30] Anecdotal evidence of the paucity of the prosecution's case against Petitioner comes from the evidence presented at the 1983 trial.  During those proceedings, the prosecution places great import on Bowen having identified the car used during the commission of the murders.  See 1983 Trial Tr. at 242 – 43.  According to testimony, Bowen was taken by police to a garage in Greensburg, Pennsylvania, and, on his own, identified a 1972 Ford Torino that had been owned by Scaglione, as the getaway vehicle.  Id. at 243.  In response to this seemingly-damning turn of events, the defense presented the testimony of Evelyn DeLuca, the woman who owned that particular car at the time of the murders.  Id. at 276 – 78.  She sold it to Grabiak Chevrolet in New Alexandria, Pennsylvania, in July of 1978.  Id. at 277.  The defense also presented the testimony of Sandra Stevick, the custodian of records at Grabiak Chevrolet, who testified that, according to her records, Scaglione purchased this automobile from them in August of 1978.  Id. at 271 – 72.  Scaglione did not own the car, nor did he have access to it (according to the testimony of DeLuca) until multiple months after the murders.  Id. at 277 – 78.  Needless, to say, Bowen's identification of the Torino did not play a large role in the prosecution's case at Petitioner's 1986 trial.  See generally, 1986 Trial Tr.  While Bowen did testify at the 1986 trial that he never said he knew who owned the car he purportedly drove to and from Bear Rocks on December 2, 1977, id. at 238 – 41, his identification of this particular automobile as the vehicle in question was clearly based on knowledge that could have been obtained only well after the murders had been committed.  This incident further undermines Bowen's general credibility as a (continued . . .)

case that ties Petitioner to the crimes, which is underscored by the neutral results of forensic tests on the remaining evidence in the Kinch report. In light of this, Bowen's testimony was absolutely essential to Petitioner's 1986 convictions, and without it, the prosecution clearly could not have obtained his conviction. This Court concludes that Petitioner's new evidence so undermines that testimony that the "new evidence of innocence" requirement for second or successive petitions has been met. Cf. Beard, 633 F.3d at 134 n.3 (noting the high level of materiality of evidence impeaching a witness "whose testimony is uncorroborated and essential to the conviction" (internal quotes and citation omitted)).

Next, a review of the entirety of the record, including the 1983 criminal trial, the 1986 criminal trial, Petitioner's state court collateral proceedings, and both habeas proceedings, yields additional clear and convincing evidence that, but for the plethora of constitutional violations that plagued the 1986 trial, no reasonable factfinder would have convicted Petitioner.

First and foremost on this list is the addendum to Alford's autopsy report. (ECF No. 75 at 6). This report contained the following language:

> More samples were examined for Acid Phosphatase.[31] The highest
> value found was 30 I.U.[32] with 60% prostatic fraction activity.

---

witness, and should have led the prosecution to question the general veracity of Bowen's "eye-witness" testimony. Indeed, the ancient Roman maxim *falsus in uno, falsus in omnibus* (false in on thing, false in everything) – meaning "that a jury may disregard the testimony of a witness if the jury believes that witness deliberately, or willfully and corruptly, testified falsely about a material issue" seems particularly applicable to Bowen's testimony. See Commonwealth v. Vicens-Rodriguez, 911 A.2d 116, 117 (Pa. Super. Ct. 2006).

[31] Acid phosphatase is an enzyme found, *inter alia*, in the prostate and in semen. See Vol. 1 A-CG, J.E. Schmidt, M.D., Attorneys' Dictionary of Medicine A-70 (Matthew Bender).

[32] An I.U., or International Unit, is a standardized unit of measurement for biological substances. See Stedman's Medical Dictionary 1008, 2067 (28th ed. 2006).

> Determination of blood group substances in rectal content revealed the presence of A group substances and a small amount of H antigen.[33]  (The deceased has blood group A).
>
> In view of the very small number of spermatozoa seen, low Acid Phosphatase activity and results of blood group antigen detection, contamination of the rectum from deceased's own urethra during autopsy cannot be entirely ruled out.

Id.  Petitioner avers that he is of blood group B.  See PCRA III Ap. Ct. Op. at 78.  The record does not indicate that Respondents dispute this fact.

If events had occurred as Bowen had testified, and Petitioner had anally raped Alford prior to murdering him, then one would expect that some physical material of blood group B would have been left behind.  However, as this report indicates, that was not the case. Additionally, whatever evidence there was appears to have come from an individual of blood group A.[34]  Id.  While this evidence does not prove Petitioner's innocence in and of itself, it does provide substantial support for his gateway claim of innocence.

Next, this Court addresses four pages of documents related to hearings on the revocation of Bowen's parole.  (ECF No. 4-1 at 11 – 14).  These were submitted as part of the instant

---

[33] H antigen is a substance that can be secreted by some individuals within the ABO blood group. See Stedman's Medical Dictionary 106 (28th ed. 2006); see also House v. Bell, 547 U.S. 518, 529 (2006).  The record does not indicate whether Petitioner or Alford were secretors of H antigen.  However, approximately 80 % of the general population are H antigen secretors. House, 547 U.S. at 529.

[34] The Court notes that contamination from Alford's own urethra could not be "entirely ruled out."  (ECF No. 75 at 6).  Dr. Sava's recognition of the possibility of contamination was based, inter alia, on the low number of spermatozoa that he found in Alford's rectum.  It follows that if these spermatozoa are from Alford's own urethra, then it could not, logically, have come from another source.  As such, even if the possibility of contamination is realized, Bowen's account of Petitioner raping Alford, and then murdering him a few minutes thereafter, becomes improbable. See 1986 Trial Tr. at 242, 251.

petition as evidence of <u>Brady</u> violations during Petitioner's criminal trials, but were found to be untimely for the reasons stated in Part III of this opinion, *supra*.

These documents mention three separate criminal actions in the Court of Common Pleas of Westmoreland County, Pennsylvania: 1356 October Term, 1977; 632 C 1981; and 633 C 1981. The first two pages are dated April 8, 1983. <u>Id.</u> at 11 – 12. Pages three and four do not contain legible date stamps, but mention events that take place after November 31, and December 1, 1983. <u>Id.</u> at 13 – 14. One of the documents dated April 8, 1983, contains the following passage: "[a]ctor's present situation does not permit the discussion or explanat[ion of] the above changes with the exception of No. 3 [[a]rrested and adjudged guilty of summary offense (7)]. The Actor is present [sic] in a situation which could solve his charges stated above." <u>Id.</u> at 12. Pages three and four, which were clearly filed after pages one and two, both contain the phrase "[t]his petition was not filed before this date at the request of [Westmoreland County] D.A. John J. Driscoll because of the Actor's role as a witness in a murder trial in Fayette County." <u>Id.</u> at 13 and 14. This evidence was found by the Third PCRA trial court to be evidence of a deal for between the district attorneys of Westmoreland County and Fayette County to provide some level of leniency for Bowen's testimony at Petitioner's criminal trials. PCRA III Trial Ct. Op. at 89.

The Superior Court addressed this piece of evidence and, for the reasons stated above in Part III, *supra*, found the issue to be previously litigated or waived. PCRA III Ap. Ct. Op. at 80. Ignoring the factual assessment of the trial court, the Superior Court found that this evidence did not support the conclusion of the existence of a deal for Bowen's testimony, based largely on Solomon's testimony indicating that no deal had been made. <u>Id.</u> at 81 – 82; <u>see</u> <u>also</u> PCRA III

Hearing Tr. of Aug. 13, 2003, at 102 (ECF No. 21-24 at 13). As such, the Superior Court concluded that these documents were not exculpatory to Petitioner. PCRA III Ap. Ct. Op. at 80.

An agreement between a prosecutor and a witness for some quid pro quo in exchange for testimony at trial is an archetypical form of impeachment evidence. See Giglio, 405 U.S. at 154 – 55. This is especially true given the degree to which the prosecution's case rested on Bowen's testimony. While the Superior Court characterized these documents as "innuendo without supporting evidence," the trial court judge – who had the benefit of actually hearing the testimony of Solomon which ranked so highly in the Superior Court's analysis – thought differently. As such, this evidence weighs in favor of Petitioner's position.

Indeed, the record references multiple pieces of evidence that, if used properly by defense counsel, could further undermine Bowen's credibility. Two of these are reports written on November 26, and December 4, 1991, by FBI Special Agent Matthew Schneck ("Schneck") Addendum to PCRA III Trial Ct. Op. (ECF No. 21-28 at 15 – 20). These reports relate statements made by Bowen in interviews with Schneck on November 22, and 27, 1991, in Okmulgee County, Oklahoma, Jail. In the these statements, Bowen indicated that he was promised money and help with legal problems by Goodman and other state police officers to present false testimony implicating Petitioner in the Bear Rocks murders. Bowen also indicated that he was given at least some money by these state actors. These reports also indicate that Bowen was a witness against Scaglione in another murder trial, and that Scaglione and his accomplice to that killing had asked Bowen to provide them with alibis. Furthermore, Bowen alleged that he had been assaulted by Goodwin and threatened with false prosecution for the killings of Alford and Gierke if he did not follow the script presented by authorities and name

Petitioner as one of the killers.  Finally, Bowen stated that he had no part in the Bear Rocks murders, and did not meet Petitioner until March of 1978.[35]

On July 31, 1992, during the pendency of the PCRA I proceedings, Bowen appears to have been interviewed by then-sergeant of the Pennsylvania State Police George Fayock ("Fayock").[36]  Fayock characterized Bowen to have "recanted [his earlier] recantation" during this interview.  PCRA III Aug. 13, 2003, Hearing Tr. at 179 (ECF No. 21-23 at 20).  Indeed, the Superior Court describes, with pinpoint citations to the transcript, how Bowen claimed that Petitioner, through his attorneys, threated Bowen and offered him money to recant his statements, and implicate Goodwin, Solomon, and Warman in suborning his perjury during Petitioner's criminal trials.  PCRA III Ap. Ct. Op. at 88 – 90.  After recanting his testimony during Petitioner's criminal trials, Bowen apparently came forward to set the record straight

---

[35] There is evidence on the record that, on April 4, 1992, Bowen executed a sworn affidavit in which he recanted his testimony at Petitioner's criminal trials.  See PCRA I Trial Ct. Op at 8 – 9 (ECF No. 20-58 at 9 – 10).  This Court has been unable to locate a copy of that affidavit in the record.

[36] The transcript of this interview was held by the PCRA III Superior Court to have been timely filed during the PCRA III proceedings.  PCRA III Ap. Ct. Op. at 88.  That court treated it as evidence submitted by Petitioner in support of his Brady claims, and found that it was not exculpatory.  Id. at 90.  Furthermore, to the extent that it provided support for the position that a transcript had been made of Bowen's September 9, 1992, statement to authorities, the issue had been previously litigated during PCRA I.  Id. at 92.  This court has searched the record before it, and was unable to locate a transcript of this interview.  As such, to the extent that Petitioner attempts to base a direct claim for relief upon it, the undersigned is unable to determine whether the Superior Court's interpretation of it was unreasonable under clearly established Supreme Court precedent.  However, that does not preclude the testimony of Fayock at a PCRA III hearing concerning the transcript, nor the Superior Court's treatment of it, from being considered when analyzing Petitioner's gateway claim of innocence.

because he could not "ruin five men's lives and reputation [sic] and, you know, for the handful [sic] of money because it just got to eaten' [sic] at [him].[37]" Id. at 90.

Both of these pieces – to a greater or lesser extent – demonstrate that Bowen is, generally, not a credible witness. As such, they provide support for Petitioner's gateway claim of innocence.

Next, the issue of a the making of a tape-recording of the September 9, 1982 statement given by Bowen to the Fayette County District Attorney's office, and the subsequent deletion and concealment of any reference to that recording by Warman – with Solomon's knowledge and tacit approval – in Goodwin's report of September 10, 1982, has been a major issue in this litigation since 1992. Judge Feudale found that this act had "so undermined the truth-determining process that no reliable adjudicate of guilt or innocence could have taken place." See PCRA III Trial Ct. Op. at 64 – 65, 68 – 69, 102. The acts of Kopas with respect to the PCRA I proceedings further underscore the level of gamesmanship of the prosecution with respect to this case.

In adjudicating the Commonwealth's appeal for Judge Feudale's grant of relief, the Superior Court found that the issue had been previously litigated during the first PCRA proceedings, and that the new testimony presented by Goodwin affirming that a recording of the statement was made – where he could not recall whether one had been made when he testified

---

[37] Judge Feudale clearly took issue with the circumstances of Bowen's retraction of his recantation of his testimony tying Petitioner to the murders at Bear Rocks, noting with irony that Bowen was threatened with prosecution for perjury after his initial recantation, but was granted immunity for the purposes of retracting it and returning to his initial story. PCRA III Trial Ct. Op. at 110.

during a PCRA I hearing – was not of sufficient substance for Judge Feudale to revisit the PCRA I trial judge's factual findings.[38]  PCRA III Trial Ct. Op. at 62 – 64.

As of the date of this writing, no tape recording of Bowen's September 9, 1982, statement has been produced.  However, two waiver forms from that date, which were signed by Bowen (ECF No. 4-1 at 20 – 21), Goodwin's testimony at during the PCRA III proceedings, the redacted and unredacted copies of the infamous Goodwin report, and Judge Feudale's findings of fact with respect to the misconduct of the prosecution in this case, all belie any assertion that a statement was not made.  The outrageous misconduct in which the prosecution engaged during the criminal trials and the PCRA I proceedings further undermines Bowen's testimony, and casts a pall of doubt over every single piece of evidence presented by the prosecution in support of its case.

The next piece of evidence on the record as a whole is the Bates report.  (ECF 4-1 at 1); see also PCRA Ap. Ct. Op. at 67 – 68.  This document was written on January 6, 1978, by Trooper George Bates ("Bates").  It related his attempt that day to serve a bench warrant on Bowen.  He was told by Mary Caccia ("Caccia") that Bowen had left for Oklahoma on December 1, 1977, and was staying there with his father.  Id.  Bowen was returned to Pennsylvania from Oklahoma a few months later to face burglary charges.  A reasonable factfinder could rely on the information to conclude that Bowen was not in Pennsylvania at the time of the murders on December 2, 1977 – or, at least, was well on his way to Oklahoma at the

---

[38] The undersigned notes, with some sense of irony, that Judge Franks, the PCRA I trial judge, testified at a PCRA III hearing that, had he been presented with the additional evidence currently before this Court, he may have granted relief in 1992.  PCRA III Trial Ct. Op. at 78 - 79.  While this fact was mentioned explicitly by Judge Feudale in his opinion, the Superior Court did not address it.

time.  It is true that the defense did try to impeach Bowen's testimony at the 1986 trial with respect to his whereabouts on the night of the murders, and that "the contention that Bowen was not in Pennsylvania at the relevant time is not a new claim."  PCRA III Ap. Ct. Op. at 68 n.9.  However, this report, along with the existence of Caccia as a witness, provides a strong basis for this "contention," and provides support for Petitioner's actual innocence.[39]

Next, it must not be overlooked that, Scaglione, at his own trial, admitted to committing the murders, but testified that Petitioner had no role in the killings.  See 1986 Trial Tr. at 330.  Instead, one Homer Stewart, a now-deceased individual who allegedly bore some likeness to Petitioner, was alleged to be Scaglione's accomplice.  Id.; see also PCRA I Trial Ct. Op. at 11 (ECF No. 20-58 at 12 – 13).  While it is doubtful that this testimony would be admissible at trial, it does weigh, however slightly, in Petitioner's favor.

The penultimate piece of evidence addressed by the undersigned is the testimony of Kenneth Knight ("Knight") during the PCRA I proceedings.  See PCRA I Hearing Tr. of Sept. 8, 1992 at 169 – 207 (ECF No. 20-39 at 24 – 41; ECF No. 20-40 at 1 – 21).  During those proceedings, Knight testified that he had personal knowledge that Bowen was in Oklahoma at the time of the murders, and that Bowen had admitted multiple times to lying under oath at Petitioner's 1986 retrial.  PCRA I Hearing Tr. of Sept. 8, 1992 at 187.  Knight also testified that it was he who had first introduced Bowen to Petitioner and Scaglione, but that was not until March of 1978, when they were all in Westmoreland County Jail together.  Id. at 174.

---

[39] Additional evidence that Bowen was not in Pennsylvania at the time of the murders may be found in Petitioner's exhibits to his pro se PCRA petition.  See (ECF Nos. 21-9 – 21-10).  While the Bates report is the most solidly impeaching piece of evidence among these exhibits, each of them, if used correctly, could undermine Bowen's credibility.

Furthermore, Knight was on the prosecution's witness list to testify at Petitioner's trial. He alleges that, as he preparing to testify, he informed the district attorney that Bowen was in Oklahoma at the time of the murders, and would testify as such. Id. at 6 – 7. Allegedly as a result, Knight was never called to the stand.

The PCRA I trial court found that Knight's testimony with respect to the prosecution's knowledge of his intent to testify that Bowen had been in Oklahoma when the Bear Rocks murders were committed to be incredible, and denied relief on that basis, as well as on the basis that Knight was equally available to the defense to be interviewed prior to trial. PCRA I Trial Ct. Op. at 10 – 11. In spite of this unfavorable credibility determination on that issue, this evidence still provides a basis for impeaching Bowen's testimony, and weighs in favor of Petitioner.

Finally, this Court notes that, about a year after the incident during which Petitioner allegedly confessed to her at a bar, Dahlmann was contacted by an acquaintance named Tom Clawson. This individual confessed to her that he, her ex-husband, Wiltrout, and another individual named Gary Coccioletti, had committed the Bear Rocks murders. Dahlmann contacted Goodwin when this happened, and it appears from her statements made in chambers during the 1983 trial, that Goodwin, while hidden, was able to overhear part of this confession. 1983 Trial Tr. at 215 – 19.

Based on the above evidence, the undersigned determines that no reasonable factfinder, when properly instructed, could find Petitioner guilty of the murders of Alford and Gierke, but for constitutional error. As such, Petitioner has prevailed in his gateway claim of innocence, and it is proper to grant the writ.

## VI.  Certificate of Appealability

With respect to Petitioner's <u>Brady</u> claims, and ineffective assistance of counsel claims, based on his untimely-asserted evidence, a certificate of appealability will be denied because jurists of reason would not find it debatable whether these claims were untimely.  <u>See</u>, <u>e.g.</u>, <u>Slack</u>, 529 U.S. 473, 78 (explaining standard for grant of a certificate of appealability where court does not address petition on the merits but on some procedural basis).


## VII.  CONCLUSION

Based on the analysis above, this Court concludes that Petitioner demonstrated that the prosecution at his 1986 murder trial suppressed favorable evidence that was material to the determination of his guilt or innocence.  The suppression of this evidence deprived Petitioner of a constitutionally-adequate trial, and the resulting verdict is not worthy of confidence.  Additionally, Petitioner has adduced new, credible evidence of his innocence, and it is clear that, in light of that evidence along with the 30-plus-year record as a whole, no reasonable trier of fact could have convicted Petitioner of the crimes with which he was charged, but for the multitude of constitutional violations that occurred in this case.  Accordingly, upon thorough review of Petitioner's claims through the lens of the AEDPA's strict procedural requirements, this Court will grant, conditionally, the instant petition for writ of habeas corpus.

An appropriate order will follow.

Dated:  August 5, 2011                    By the Court:

_____
LISA PUPO LENIHAN
Chief United States Magistrate Judge

cc: counsel of record